MILLER *v.* STATE OF INDIANA.

[No. 31,000. Filed May 13, 1968. Rehearing denied July 11, 1968.]

*John Martin Smith,* of Auburn, and *Stephen J. Williams,* of Roanoke, for appellant.

*John J. Dillon,* Attorney General, and *Rex Phillip Killian,* Deputy Attorney General, for appellee.

LEWIS, C. J.—This is an appeal from a conviction of the appellant by jury for the crime of Murder in the Second Degree. The appellant was legally separated from his wife and had been given custody of their children. On November 29, 1965, the children had been visiting with their mother, and their father came to take them home.

The appellant had been aware, for some time, that the victim and his wife had been having an illicit affair. He took his children home and left them with his mother. Then, he left again to go out to dinner. It was then approximately ten o'clock on the evening of the shooting. After eating, appellant drove past his wife's apartment where he observed the victim leaving and driving away. The appellant wished to talk to the decedent and, thereupon, followed him to his home. When the decedent got out of his car and started to walk up to his house, the appellant called to him and engaged him in conversation. The decedent began to walk toward the appellant who was still seated in his car. The appellant warned him not to come any closer as he had a loaded rifle. The evidence at this point is conflicting. The appellant states that the decedent was very close, suddenly grabbed the rifle, and pulled on it causing it to discharge. The State contends that the appellant shot the decedent before he grabbed the weapon. After the shooting, the appellant, realizing what had transpired, panicked and fled. Also, it is important to note that the murder weapon was never found.

In resolving this conflict in the evidence, the distance between the decedent and the appellant at the time the victim was shot is a very critical factor. If the victim was standing several feet away from the muzzle of the weapon when he was shot, he could not have grabbed it causing it to discharge. However, if it could be proven that he was standing next to the car when he was shot, it would give credit to the appel-

lant's story. Therefore, it is obvious to all concerned that the evidence introduced at trial bearing on this issue was very important; and, as one of his assigned errors, the appellant asks this Court to examine the expert testimony of one Kenneth Houck who had conducted some experiments regarding this point.

Simply stated, the State attempted to show that if the victim had been any closer than five (5) feet to the muzzle of the weapon when it was discharged, there would have been powder burns and residue on his clothing at the point of the projectile's entry. However, examination by police revealed no such burns or residue.

In examining this evidence we will start with the testimony itself. Set out herein are the pertinent excerpts from Mr. Houck's testimony.

"A. In the firing of any *given* firearm, the force or energy placed on the bullet that drives the bullet out the barrel of the firearm is a result of the combustion of the propellant in the cartridge, and it's the buildup of pressure behind that bullet that pushes the bullet down and out the barrel. As the bullet comes out the muzzle of the firearm, the amount of gas forcing the bullet then strikes the air. This propellant is a progressive burning propellant, and some of the propellant itself is not completely burned. Now what is left is dependent on the closeness of the object to the muzzle at the time it is fired. If you are quite close to the muzzle, you will find that there are actual powder burns to have been left on the object, to the extent if it is clothing, you will find an actual burning of the fibre itself. If it is tissue, you will find a sort of melting type thing, a scorching. Included in this will be the blackness, the smoke, the smudging as a result of that combustion, and then also unburned powder. Now as you move out from the muzzle of the firearm, your secondary phase, there you will eliminate the actual burning, because the distance is greater, but you will then have the smudging and the unburned powder represented. The third phase is such whereas you would find unburned powder only because the powder itself being heavier than what the gaseous smudging is and the burning, it will carry

further, so you will find unburned powder at a much greater distance from the muzzle than you will the combined" (our emphasis).

"Q. And what would determine whether or not these things would be present, or any of them?

A. The distance that the muzzle was to the object at the time the shot was fired.

Q. And what elements would determine *in a particular case* whether you would expect to find these things, or what distances you would not expect to find them?

A. We have several factors. Firstly, would be the distance itself. This would be dependent upon the *type of cartridge, the propellant within the cartridge,* the *weight of the bullet* itself, and *the firearm from which it was fired"* (our emphasis).

"Q. From your findings, do you have an opinion as to the distance at which the victim stood from the muzzle of the gun at the time the shot was fired in this case?

A. Yes, sir, I do.

Q. And upon what do you base such an opinion?

A. On test firing of a rifle *similar* to the one indicated in this case" (our emphasis).

"Q. Now what in your opinion was that distance in this case?

A. That powder residue is demonstrable up to a distance of five feet. The firearm itself will leave residue in excess of five feet. I test fired to a distance of eight feet, which there is unburned powder present, although at these distances beyond five feet the residue itself is in an area from the bullet entrance itself at such that there would be a possibilty of it not being detected in the examination.

Q. And do I understand your testimony, Sgt. Houck, that the victim would have been a minimum of five feet from the muzzle of the gun at the time the gun was fired?

A. Could have been, yes, sir.

Q. Could he have been closer than five feet?

A. Not to have been without powder residue.

> Q. Then do I understand it is your opinion in this case that he was at least five feet from the muzzle of the gun?
>
> A. That is correct, Yes, sir."

Timely and stenuous objection was made to this testimony by the defense counsel which may be generally summarized into the statement that the experiment was not conducted in the same manner, nor under the same conditions, as the shooting occurred. He emphasizes that a different rifle was used in the experiment and the cartridges tested were not the same as those found in the car of the appellant at the time of his arrest. This difference in the cartridges is germane in that those used in the experiment were hand loaded, and those found in the car of the appellant were commercially loaded.

We wish to re-emphasize a portion of the expert's own testimony in saying that the specific distance between the muzzle of the weapon and that of the victim in which the victim may or may not receive powder burns is dependent in part upon (1) a given weapon, (2) the type of cartridge, (3) propellant within the cartridge, and (4) weight of the projectile itself.

This problem is not new to Indiana. In *Thrawley* v. *State* (1899), 153 Ind. 375, 55 N. E. 95, an expert testified against appellant's claim that the homicide occurred in a hand-to-hand combat, as

> ". . . to the results of experiments in shooting with appellant's revolver at blotting-pads. This evidence was limited by the court to the purpose of showing how far unburned grains of powder would carry. . . ."
>
> ". . . In the experiments in question, *the same make and grade of cartridges* were used that appellant employed in the homicide. It appeared in evidence that *these cartridges are standard and very uniform in operation*. In relation to the distance to which unburned grains of powder carry, *the conditions prevailing at these experiments were substantially the same as those at the homicide*. It was important that the jury should know at what distance from the muzzle the shot would fail to burn or powder-mark the deceased's scalp. The evidence of the witness and the ex-

hibition of the blotting-pads were competent for this purpose. *State* v. *Jones,* 41 Kan. 309, 312, 21 Pac. 265; *Sullivan* v. *Commonwealth,* 93 Pa. St. 284; *Boyd* v. *State,* 14 Lea 169 (Tenn.)" (our emphasis).

Looking to other jurisdictions, the case of *Epperson* v. *Commonwealth* (1929), 227 Ken. 404, 13 S. W. 2d 247, from the Kentucky Court of Appeals is helpful. In this case the defendant had alleged that his wife had committed suicide; however, there was no evidence of the bullet passing through her clothing and no powder burns on her body or apparel. The Court stated:

". . . The sheriff of the county was introduced, and he was permitted to testify that he had *taken a towel and tacked it on a log and had fired into it with Epperson's pistol* at a distance of six inches, at a distance of one foot, and at a distance of two feet, and was permitted to exhibit this towel, with powder stains thereon, to the jury. The courts have been very careful about admitting evidence of such experiments. . . . It is admitted that this shot passed through no part of Mrs. Epperson's clothing, and the texture of her body is so entirely different from the texture of the towel, upon which the experiments were made, that evidence regarding these experiments should not have been given to the jury. . . . In order that an experiment shall possess sufficient probative value to warrant the admission of evidence thereof, *it is necessary that the circumstances under which the experiment is made shall have been similar to the circumstances prevailing at the time of the occurrence involved in the controversy and that the materials and instrumentality used shall be substantially the same.* A wound made upon a human body by a revolver held directly against it might be very different in appearance from a wound made by the same revolver held two inches, four inches, six inches, or any other distance from it, and might also differ materially from a wound made by an automatic or a rifle used under the same circumstances. . . ." (our emphasis).

Similarly the Supreme Court of Mississippi had the following to say in *Done* v. *State* (1947), 202 Miss. 418, 32 So. 2d 206, wherein the appellant, accused of shooting his wife, main-

tained that a pistol had fallen out of the glove compartment of the car in which they were both riding and it accidentally discharged.

"The Stated relied . . . upon a test made by the sheriff *with his own pistol (not the appellant's) of the same caliber and make* as an experiment to determine effect of various distances as to powder burns. *The test was not made under identical conditions,* or even under reasonably comparable circumstances. Furthermore, the tests to which the sheriff testified were made with a towel nailed to a tree, and with a different pistol. It will be seen that they were not 'so nearly the same' (as the conditions of the actual shooting in the car) 'in substantial particulars as to afford a fair comparison in respect to the particular issue to which the tests are directed.' *Brown* v. *State,* 176 Miss. 488, 169 So. 837, 838. As was said in *Harrison* v. *Southern Railway Co.,* 93 Miss. 40, 46 So. 408, 410, the experiments there were made 'under like conditions in every respect, and we fail to see any sound reason which can support the exclusion of the testimony taken under circumstances identical, or nearly identical, with those obtaining on the day the injury was inflicted.' That was not so here. Appellants objection to this evidence should have been sustained, and we sustain the assignment of error embodying it here. . . ."

From these cases we must conclude that the testimony based on the experiment in the case at bar was erroneously admitted into evidence and was inconclusive. The murder weapon was never found, thereby necessitating the use of a "similar" weapon. However, in *Thrawley* v. *State, supra,* the weapon used for the experiment and the murder was the *same.* This is a very important factor in an experiment of this nature. Indeed, in expert Houck's own testimony he stated: "In the firing of any given firearm. . . ." Notwithstanding the discrepancy of the weapons used, the cartridges used are disputed as well. It was not adequately proven at trial whether the victim was shot with the commercially-loaded or hand-loaded cartridges. The murder weapon had been borrowed by the appellant from a friend who also gave him a box of hand-loaded cartridges. When appre-

hended, the appellant had a box of commercially-loaded shells in the trunk of his automobile, and at trial he stated that he believed a commercially-loaded shell was the one used in the shooting. The hand-loaded shells were the ones used in the experiment.

Other variables were mentioned as well, such as atmospheric conditions, relative conditions of the weapons, and the respective weights of the bullets, none of which were adequately provided for in the experiment.

The experiment in the case at bar did not conform to the standards as set out in *Thrawley* v. *State, supra,* nor even those set out in the testimony of expert Houck. Therefore, we are compelled to rule that it was prejudicial error to admit this into evidence, and a new trial is hereby ordered.

Arterburn, Hunter, Jackson and Mote, JJ., concur.

NOTE.—Reported in 236 N. E. 2d 585.