**Raymond Eugene BIXLER, Appellant,**

v.

**STATE of Indiana, Appellee.**

**No. 982 S 365.**

Supreme Court of Indiana.

Dec. 17, 1984.

Rehearing Denied Feb. 20, 1985.

Peter W. Bullard, Dibble, Bullard & Bartlett, Lafayette, for appellant.

Linley E. Pearson, Atty. Gen., Amy Schaeffer Good, Deputy Atty. Gen., Indianapolis, for appellee.

PIVARNIK, Justice.

Defendant-Appellant Raymond Eugene Bixler was found guilty by a jury in the Benton Circuit Court of murder. He subsequently was sentenced by the trial judge to a term of fifty years imprisonment. Defendant now directly appeals and raises the following twelve issues for our consideration:

1. alleged juror misconduct;

2. denial of Defendant's motion to strike certain testimony;

3. denial of Defendant's motion for change of venue from the county;

4. denial of Defendant's motion for change of venue from the judge;

5. certain final instructions;

6. alleged prosecutorial misconduct;

7. denial of motion to let Defendant to bail;

8. jury view of exhibits during deliberations;

9. denial of motion for new trial based on threatening phone calls to Defendant's family;

10. sufficiency of the evidence;

11. cumulative effect of all errors; and

12. alleged improper sentencing.

Defendant Raymond Bixler lived with his mother, Mrs. Reva Pollock, and her husband, on her three-acre tract of land situated in rural Benton County. In 1979, the Lank family purchased ten acres which bordered the Pollack's property. The Lanks did not live full time on their property but used it primarily for weekend family get togethers and hunting. Some of their family activities included target practice, drinking beer and playing music. Late in April, 1981, the Lanks purchased an eighty-acre tract situated on another side of the Pollack property, access to which was gained by a thirty-foot wide lane between the properties along the east boundary of the Pollack property and the west boundary of the Lanks' ten-acre tract. Conflict arose between Defendant's family and the Lanks as to the ownership of the access lane used by the Lanks. Defendant and his mother opposed the use of said lane by the Lanks. A land survey made in December, 1980, prior to the Lanks' purchase of the eighty-acre tract, showed the lane was almost entirely on the Lanks' property. Defendant and his mother, however, persisted in efforts to obstruct the lane by placing boulders and an old pickup truck across it. The Lanks rented out the tillable area of the eighty-acre tract to a farmer who grew hay on it and Defendant allowed the farmer to pass through the lane to harvest the hay. In July, 1981, the Lanks had a bulldozer brought out to clear some of the eighty acre tract to create more tillable area. They took down the fence which blocked part of the lane to get the bulldozer back to the tract. Defendant became increasingly irritated and exclaimed on several occasions that if the Lanks used the bulldozer to move his pickup truck off the access lane, he would shoot the person doing it. Negotiations were in progress between attorneys for both parties at-

tempting to settle the issue in some manner. On Sunday, July 12, 1981, young Ronald Lank was operating the bulldozer on the back eighty acres. He started down the disputed lane along the Pollack property and positioned the bulldozer to push the pickup off the lane. Ronald was packing a .357 Magnum handgun in a holster fastened around his waist. He pushed the pickup truck back about fifteen feet. Defendant, who had been sitting at a nearby picnic table, ran inside the house, grabbed his shotgun, came outside and shot Ronald Lank thereby killing him.

## I

Defendant now argues that there was juror misconduct which entitled him to a new trial on two grounds. Defendant first contends the jury used improper methods in deliberating and arriving at a verdict. Secondly, Defendant contends that some of the jurors concealed personal relationships that contributed to their partisanship during his trial.

Defendant submitted affidavits from some of the jurors which detail discussions had in the jury room and some tests conducted by them concerning the .357 Magnum pistol found in the victim's possession after his death. The trial court held a fact-finding hearing on July 2, 1983, on this subject and denied any relief to Defendant. We find the trial court acted properly in this regard. A verdict of a jury may not be impeached by the affidavits or testimony of those who returned it. *Bean v. State*, (1984) Ind., 460 N.E.2d 936, *reh. denied*. Juror affidavits or testimony may not be used to demonstrate improprieties in the method by which the jury reaches its verdict. *Brown v. State*, (1983) Ind., 457 N.E.2d 179. The issue of juror misconduct is a matter within the trial court's discretion and there is no showing here that the trial judge abused his discretion in finding as he did. *Smith v. State*, (1982) Ind., 432 N.E.2d 1363.

Defendant also attempts to show that certain members of the jury were biased because one was a distant relative, by marriage, of the victim's wife, and another juror had a prior attorney-client relationship with the prosecuting attorney. The trial court properly held a fact-finding hearing to inquire into these charges against the jurors. *See Stevens v. State*, (1976) 265 Ind. 396, 354 N.E.2d 727, *on rehearing* 265 Ind. 396, 357 N.E.2d 245. The facts thereby produced showed that juror McGrath had been a co-defendant in a civil action in which the prosecutor, Attorney Bill Weist, was acting as assistant counsel to lead counsel Doug Elwood and the attorney of the other defendant in the action. McGrath stated that Weist had virtually no role in the legal representation. McGrath also said he considered Attorney Tom McConnell to be his attorney and that Weist appeared only to assist Elwood and took very little part in the case. We do not doubt that Weist's participation was very limited since the matter was settled out of court before it ever went to trial. Weist never entered into any agreement of employment with McGrath and never billed him. Weist testified that he thought little of the case since he never really considered McGrath as his client in the cause.

Juror Garriott failed to disclose that his wife had worked for the victim's mother in her upholstery business and that his cousin's wife was an aunt of the victim's wife. Garriott said he did not initially remember that his wife had, in fact, worked for Bonnie Lank for a few months some ten years prior to the trial and he never had any personal dealings with Mrs. Lank at all. He said the relationship had nothing to do with his judgment of the case as he had not even thought about it. He admitted there was some distant relationship, through marriage, with the victim's wife but said there was no closeness there. Specifically, he testified that he had never even had a conversation with the victim's wife and, due to the distance of the relationship, he never really considered her a relative. Again, this relationship had nothing to do with his judgment. After hearing this evidence, the trial court found no juror misconduct and denied relief to Defendant.

In view of the facts as we have set them out, we find no error in the trial judge's determination. Defendant has not shown that he was prejudiced in any manner and we will not second guess the trial judge in his determination of issues of fact. *Smith, supra.*

## II

Several eyewitnesses testified that when victim Ronald Lank started to push Defendant's pickup truck from the disputed lane, Defendant was sitting at a picnic table in his front yard very near to the lane. Defendant immediately ran into the house, came out with a shotgun, raised it and fired at the victim. When the victim was found, he had the .357 Magnum which he had been wearing in a hoster in his hand with the hammer in cocked position. These eyewitnesses specifically testified that after Defendant shot Lank, Lank pulled the pistol and started to aim it toward Defendant but collapsed before he could fire. Defendant's version of the story was that although he came out with the shotgun, Lank stood up, drew his pistol, aimed it at him and, after that happened, Defendant shot Lank in self defense. There was testimony at trial about injury to Lank's shoulder from the shotgun blast which raised the question of whether or not Lank would have been able to raise his right arm after he was shot. Dr. McFadden, the pathologist who performed the autopsy on the victim, stated as his opinion that the victim was able to draw and cock his pistol notwithstanding the fact that his right shoulder had been injured by one of the shotgun pellets. This testimony was in conflict with other medical testimony. It developed in McFadden's testimony that he consulted with an orthopedic surgeon, Dr. Shively, who helped him reach his opinion in this matter. McFadden stated that he thought he needed to talk to a fellow expert who had more specialized knowledge of orthopedics and therefore called Dr. Shively. Defendant moved to strike all of McFadden's testimony since at least part of his opinion was based on hearsay, that being the consultation of Dr. Shively. The State contends, however, that McFadden's conference with Shively was simply additional research on McFadden's part and that whatever Shively contributed to McFadden's research would merely go to the weight of McFadden's testimony and would not destroy his expert status. We agree. An expert may rely on hearsay in forming his opinion when an expert uses other experts and authoritative sources of information like treatises to aid him in arriving at that opinion. Hearsay information customarily relied on by experts in the practice of their professions may be admitted and relied upon as a legitimate accumulation of that expert's knowledge. This Court has held:

> "There can be no hard and fast rule as to the quantum of knowledge required to qualify a witness as an expert in a given field. It has been said that he must be shown to be competent upon the subject concerning which he is to testify. The determination of whether a witness is qualified to give an opinion is within the trial court's discretion. No precise knowledge is required, if the witness shows an acquaintance with the subject such as to qualify him to give an opinion. 'The witness must have sufficient skill, knowledge or experience in that area to make it likely that his informed inference will aid the jury properly to determine such matters.' *The extent of the witness' knowledge, however, affects the weight of his testimony, which is a matter for the jury to determine.*

The qualification of an expert witness is generally left to the trial court's sound discretion, and the trial court's determination will not be set aside unless there is clear error, often termed an abuse of discretion. The requirement that a witness be qualified before being permitted to testify as such is predicated upon the witness' offer of an opinion that is based upon facts that the average juror is incapable of interpreting for himself." [Citations omitted] [Emphasis added].

*Reid v. State,* (1978) 267 Ind. 555, 560, 372 N.E.2d 1149, 1152; *See also Moody v.*

*State,* (1983) Ind., 448 N.E.2d 660. The hearsay information that Dr. McFadden used was properly admitted by the trial court and went merely to the weight of his testimony as it was considered by the trier of fact.

### III

Defendant next alleges that the trial court erred by not granting him a change of venue from the county due to the prejudicial nature of the pretrial publicity surrounding his case. In support of this motion, Defendant presented articles by local newspapers in which accounts of the events of this case were related. He also furnished the results of an opinion poll taken by polling experts he hired. Said results showed that the polltakers had contacted 130 persons in Benton County and concluded that there was bias and prejudice against Defendant such that he could not receive a fair trial in Benton County. The State's position was that it had no part in conducting the poll or in formulating the questions asked. It therefore asked that no consideration be given to the conclusions of the polltakers. The trial judge indicated that it was his duty to follow the law and not public opinion in arriving at a judgment in this matter. The trial judge accordingly found that the news articles presented were neither inflammatory nor sensational in nature but were merely factual reports.

■ Defendant admits that the record shows that he did not exhaust his peremptory challenges. The State points out, and this is not denied by the defense, that those jurors who remained on the jury panel had no opinion of guilt or innocence based on whatever they had heard or read before trial and were able to sit fairly in judgment on the case. We have held repeatedly that to prove that an error occurred in the denial of a motion for change of venue from the county, the defendant must show that he exhausted his peremptory challenges in an effort to secure juror

impartiality and also that the jury was so prejudiced against him that it was unable to render a verdict in accordance with the evidence. *Pine v. State,* (1980) 274 Ind. 78, 408 N.E.2d 1271, *reh. denied; Drollinger v. State,* (1980) 274 Ind. 5, 408 N.E.2d 1228. In *Drollinger,* we found that mere knowledge of the case by jurors does not disqualify them. In *Pine,* the Appellant contended he was unable to obtain a fair trial in Putnam County due to local adverse publicity and community friendship for the state troopers involved. This Court, however, found no error because the news accounts were not of a sensational and inflammatory nature and the appellant did not exhaust his peremptory challenges. Considering the facts and circumstances before the trial judge in this cause, we do not find that he abused his discretion by denying Defendant's motion for change of venue from the county.

### IV

■ Defendant also moved for a change of venue from the judge. In so moving, Defendant alleged that the trial judge was biased because he went to the same church as did the victim's family and had drawn up a will some years earlier for the step-father of the victim's mother. The trial judge explained on the record that although he recalled seeing members of the Lank family at St. Patrick's Catholic Church at Oxford, Indiana to which he belonged, he never socialized with them at or away from the church. He further said he never had any personal contact with them and knew them only by sight. He did at one time prepare a will for the step-father of the victim's mother and pending trial received a request by the attorney for the step-father to return the will so that it could be modified. The judge went to the elderly man's house and gave it over. While there he was confronted by the victim's mother, but nothing was said about the pending case. The trial judge said that he did not consider this in any way for or against any of the parties and denied the motion for change of judge. In *Poindexter v. State,* (1978) 268 Ind. 167, 374 N.E.2d

509, the defendant obtained an automatic change of judge. He subsequently moved for another change of judge on the basis that the new judge was prejudiced in that he lived on the same street as the prosecuting witness. In *Poindexter*, the trial judge stated on the record that he did not know the prosecuting witness and did not know where she lived. We found in that case that the trial court did not abuse its discretion by denying the motion for change of judge. Appellant has shown no relationship involving the trial judge here that would mandate him to grant a change of judge. The trial judge is a part of the society and community in which he sits, the same as any other citizen. Under the facts and circumstances presented here, we do not find that the trial judge abused his discretion by denying Defendant's motion for change of judge on the grounds stated.

V

Defendant next claims that the trial court erred by giving certain final instructions regarding self-defense and the lesser included offenses to murder.

 The record shows that the trial court instructed the jury at great length on the subject of self-defense. Appellant's complaint to the State's instruction 5—given to the jury in modified form—is that it incorrectly stated the law when it charged the jury that the State may rebut Defendant's self-defense claim by showing that he "was the aggressor and that he had no sufficient basis to believe he was in danger of death or bodily harm." This exact language was approved as a correct statement of the law in *Harris v. State*, (1978) 269 Ind. 672, 382 N.E.2d 913. Defendant's complaint as to the State's instruction 6—given to the jury in modified form—is that it charged that in "mutual combat," the defendant must first retreat before lawfully using self-defense. Defendant argues this is incorrect because the law is different when the one using self-defense is on his own property. The record shows, however, that instruction 6 and Defendant's tendered final instruction 7, which was given to the jury in modified form, adequately covered the law of retreat when one is on his own property. Instructions of course are to be considered as a whole and in their entirety. *Hughes v. State*, (1983) Ind., 453 N.E.2d 275. The language of the State's instruction 6 as given by the trial court was held to correctly state the law in *Montague v. State*, (1977) 266 Ind. 51, 360 N.E.2d 181, *reh. denied*. Defendant also claims that the State's instruction 7 was erroneously given in that it incorrectly stated the law on the defense of a dwelling. It is Defendant's contention that this instruction incorrectly stated that one cannot use defense of dwelling if in fact there had not been an attack or unlawful entry of his dwelling or premises. This instruction was given *verbatim* to that instruction approved as a proper statement of the law in *Smith v. State*, (1980) Ind.App., 403 N.E.2d 869, *Trans. denied* [footnote 5]. The property occupied by the victim at the time he was shot was an area in dispute between the parties and negotiations were in progress by their respective attorneys. Part of the State's case relative to the property line was to show the unreasonableness of Defendant's actions. As the State points out, however, the jury was instructed to view the situation from Defendant's standpoint. In final instruction 5, the trial court instructed the jury to look from the standpoint of the defendant in determining the existence of danger and the extent of force to be used. The trial court adequately instructed the jury on the defense of self-defense and pointed out to them in more than one instruction that the burden was on the State to show beyond a reasonable doubt that Defendant did not act in self-defense in order to find him guilty.

The trial court also gave lengthy final instructions in regard to lesser-included offenses to murder. The trial court first instructed the jury that if they found that the State had failed to prove any one of the essential elements of the crime of murder as charged, then they could decide whether the State had proved beyond a reasonable doubt all of the elements of one of the

included offenses of voluntary manslaughter, involuntary manslaughter, reckless homicide, criminal recklessness, battery with a deadly weapon, or battery. The trial court gave a definition of each of these lesser-included offenses and, following each definition, told the jury that if the State failed to prove each of the elements of that included offense then it could consider the next lesser-included offense. The trial court followed this procedure with every lesser-included offense up to and including the offense of battery.

 Defendant claims the instructions given on lesser-included offenses shifted the burden from the State to him. Defendant's contention seems to be based on certain language used in some of the lesser-included offense instructions which read:

"If the State did prove each of these elements beyond a reasonable doubt and that the State failed to prove beyond a reasonable doubt that the def[endant] acted without excuse or justification, you should find the defendant guilty of [naming the lesser included offense] [voluntary manslaughter—modified with 'sudden heat' provision (Record at 597); involuntary manslaughter (Record at 600); reckless homicide (Record at 601); battery (Record at 608) ]."

These statements apparently were typographical errors committed by the drafter of the instructions and the instructions were meant to read that if the State also proved beyond a reasonable doubt that the defendant acted without excuse or justification, then the jury should find the defendant guilty of the lesser-included offense involved. This language did render certain parts of the instructions confusing but did not change the essential meaning of the lesser-included offense instructions in their totality. Moreover, Defendant's instruction 8 which was given to the jury instructed the jury on the defense of legal justification as it applied to all lesser-included offenses. The instructions generally told the jury that in order to convict Defendant of murder or of any of the lesser included

offenses, they must find that the State proved beyond a reasonable doubt that all elements of that particular crime were committed by him. Instructions must be considered together as a whole and with reference to each other and an error in a particular instruction will not justify a reversal unless the error is of such a nature that the whole charge of which it forms a part misleads the jury on the law of the case. In considering all of the instructions given by the trial court here, the error made in the statement set out above is not of such a nature.

## VI

Appellant maintains there was such prosecutorial misconduct during the trial of this cause that it requires reversal by this Court. Appellant points to three separate instances in which the prosecutor reacted to legitimate objections of defense counsel by stating that Defendant did not want the jury to see the evidence to which he objected. For Example, during the testimony of Officer Robert Reed regarding his findings as to the blood alcohol content in Ronald Lank's body, the State offered Reed's written report after he had already testified about the results of the analysis. Defense counsel objected on grounds that the report was cumulative evidence and irrelevant in light of the witness' testimony to the same thing. The prosecuting attorney then made the following statement:

"Well, Judge, if he doesn't want the Jury to see it, just exclude it. I don't care; he testified about it."

Defendant claims that this statement forced defense counsel to waive the objection in order to prevent the jury from feeling there was something he was trying to hide. Defendant pointed to two other similar responses by the prosecuting attorney.

 The standard to determine whether prosecutorial misconduct has occurred is whether the conduct under all circumstances placed the defendant in a position of grave peril to which he should not have been subjected. This position should be measured by the probable per-

suasive effect of the misconduct on the jury's decision and whether there were repeated instances of misconduct which would evidence a deliberate attempt to improperly prejudice the defendant. *Rock v. State,* (1979) 270 Ind. 658, 388 N.E.2d 533; *Maldonado v. State,* (1976) 265 Ind. 492, 355 N.E.2d 843. The record shows that the defense counsel, outside the presence of the jury, objected to the prosecutor making the comments above indicated and requested that the prosecutor be admonished and that final instructions be given indicating such comments should not be considered by the jury. After hearing arguments of counsel, the trial court requested attorneys for both sides to refrain from "characterization of the evidence and the testimony." The trial court also gave a modified version of Indiana Pattern Jury Instruction 1.25 (criminal) to the jury to instruct that comments of counsel are not evidence and were not to be considered as such by the jury. Defendant now complains that the trial court did not directly admonish the prosecutor and did not specifically instruct the jury to disregard the particular objectionable comments of the prosecuting attorney. Defendant does not contend and the record does not show, however, that the prosecutor persisted in continuing to make such statements after the trial court gave its admonishment to all counsel. Furthermore, the record does not show that Defendant made any other requests of the trial court such as a direct admonishment to the jury or a motion for mistrial. The trial court did, in fact, instruct the jury that comments of counsel were not evidence. It appears the trial court did take the curative measures Defendant requested and there is no reason to presume they did not have the desired effect. We do not find reversible error on this issue.

### VII

■ Defendant claims the trial court committed reversible error by refusing to let him to bail pending trial. There is no merit to this contention. The issue is now moot since Defendant has been convicted and sentenced. *Partlow v. State,* (1983) Ind., 453 N.E.2d 259, *cert. denied* (1984) —— U.S. ——, 104 S.Ct. 983, 79 L.Ed.2d 219; *Alleyn v. State,* (1981) Ind., 427 N.E.2d 1095.

### VIII

■ Defendant also contends that the trial court committed reversible error by allowing all exhibits to go into the jury room during the jury's deliberations. The record shows the trial judge advised all counsel that he was sending the exhibits into the jury room with the jury and no objection was made by Defendant. This issue accordingly has been waived by Defendant. *Duncan v. State,* (1980) 274 Ind. 457, 412 N.E.2d 770, *reh. denied.*

### IX

Defendant contends that the trial court erred by refusing to grant him a new trial due to threatening phone calls received by members of his family during the trial. Defendant claims certain members of his family, including his children, received threats on their lives by anonymous callers. The callers were never identified. There was no evidence that the prosecution in any way was involved with the calls. There is no evidence that witnesses that might have testified for the defendant failed to come to court or that the presenting of evidence in the cause was in any way affected. The primary claim Defendant makes is that his own children did not come to court since their mother, Defendant's former wife, feared for their safety because of the threatening phone calls. There was evidence from some of the jurors that the fact that Defendant's children did not appear in court was discussed by them during deliberations and apparently some inference was made that the children may have had no interest in their father's problems since he had not treated them well in the past. Defendant claims this prejudiced him in the eyes of the jury and required a new trial. The trial judge did cooperate with the parties in having the phone company monitor the telephone lines of some of the members

of Defendant's family but no identification of the callers was made.

 As already indicated in Issue I above, a jury cannot impeach its own verdict by testimony or affidavits. There is no indication that the decision of the jury was based on the fact that members of Defendant's family did not appear in court and there is no indication that Defendant ever requested the trial court to admonish the jury on the subject. The facts already set out indicate that there were several eyewitnesses to this account who presented a great deal of evidence from which the jury could make its determination of guilt in this cause. The phone calls were actions by third parties totally outside the atmosphere of the trial itself and did not appear to involve the parties in any manner or to have affected the presenting of evidence in all regards. We therefore cannot find that Defendant's claim shows such prejudice that the trial court abused its discretion in denying a new trial on these grounds. *Partlow, supra; Wells v. State,* (1982) Ind., 441 N.E.2d 458, *reh. denied.*

### X

 Defendant next claims there was not sufficient evidence to sustain the jury's verdict of guilty of murder. To convict a person of murder, the State must prove beyond a reasonable doubt that the defendant knowingly or intentionally killed another human being. The standard of review we apply in reviewing the sufficiency of evidence in any cause was set out by this Court as follows:

"Upon a review for sufficient evidence, this Court will look only to the evidence most favorable to the State and all reasonable inferences to be drawn therefrom. If the existence of each element of the crime charged may be found therefrom, beyond a reasonable doubt, the verdict will not be disturbed. In such a review, we will not reweigh conflicting evidence nor will we judge the credibility of the witnesses." [citations omitted].

*Loyd v. State,* (1980) 272 Ind. 404, 407, 398 N.E.2d 1260, 1264, *cert. denied* 449 U.S.

881, 101 S.Ct. 231, 66 L.Ed.2d 105. There clearly was sufficient evidence before the jury in this cause to justify the finding that the State had carried its burden of proof. Although certain pertinent facts were in conflict, these conflicts were for the jury to resolve. There was evidence showing that Defendant had made threats that anyone who tried to push his pickup truck out of the disputed lane would be shot. One of the witnesses was the county sheriff who said he advised Defendant that there were other means to solve the problem. The record shows that when the victim did attempt to move the pickup truck, Defendant got his shotgun and shot him. Although Defendant claimed the victim pointed a .357 Magnum pistol at him requiring him to shoot in self-defense, several other eyewitnesses stated that Defendant immediately fired at the victim before the victim attempted to raise his own weapon. There was conflict in the medical testimony as to whether or not the victim would have been able to raise his arm with a weapon in it after he was shot. These conflicts were all resolved by the jury in their verdict of guilty and we will not retry these fact issues on appeal. We therefore find no grounds for reversal on this issue.

### XI

 Here, Defendant argues that even if none of the alleged errors merits reversal, the cumulative effect of the errors does. We have held, however, that there was no error in any of the issues raised by Defendant and we do not find that their cumulative effect gains any additional stature warranting a different conclusion. *Napier v. State,* (1983) Ind., 445 N.E.2d 1361, *reh. denied.*

### XII

 Finally, Defendant claims the trial court erred by increasing the presumptive forty-year sentence for murder when it imposed a fifty-year sentence upon him. It is within the trial court's discretion to decide whether or not the basic sentence for a crime should be increased or de-

creased according to aggravating or mitigating circumstances. *Logsdon v. State,* (1980) 274 Ind. 575, 413 N.E.2d 249. The trial court decides the weight to be given to aggravating and mitigating circumstances based on all the facts and circumstances surrounding the offense and the offender and the trial judge has the duty to make his findings on the efficacy of the aggravating or mitigating circumstances. *McManus v. State,* (1982) Ind., 433 N.E.2d 775. We review a sentence, if otherwise proper, only to determine if it is not manifestly unreasonable so that no reasonable person could find such sentence appropriate to the particular offense and the offender. Ind.R.App.Rev.Sen. 2; *Vacendak v. State,* (1982) Ind., 431 N.E.2d 100. Here the trial court found Defendant was of above average intelligence and that he could and did form the intent to kill the victim. The trial judge also found that a reduced sentence would depreciate the seriousness of the crime. He then concluded that incarceration of greater than the presumptive sentence was necessary and indicated that the offense occurred under circumstances likely to recur since the legal dispute from which this arose was still pending. The trial judge properly followed the law and gave sufficient reasons for arriving at the sentence he imposed. We do not find such sentence unreasonable and inappropriate considering the offense and offender.

Finding no error, we affirm the trial court in all things.

GIVAN, C.J., and DeBRULER, HUNTER and PRENTICE, JJ., concur.