Gregory P. SMITH, Appellant
(Defendant below),

v.

STATE of Indiana, Appellee
(Plaintiff below).

No. 185S23.

Supreme Court of Indiana.

April 16, 1987.

Susan K. Carpenter, Public Defender, C.H. Gardner, Deputy Public Defender, Indianapolis, for appellant.

Linley E. Pearson, Atty. Gen., John D. Shuman, Deputy Atty. Gen., Indianapolis, for appellee.

PIVARNIK, Justice.

Defendant-Appellant, Gregory P. Smith, was convicted by a Tippecanoe County jury of murder. The trial court sentenced him to thirty-eight (38) years imprisonment. In this direct appeal, Appellant raises the following issues for our review:

1) whether the trial court erred in refusing Appellant's tendered final instructions 2, 3, 4, 7, 8, and 9;

2) whether the trial court erred in giving final instruction C–11, 4, and 9;

3) whether the trial court erred in excluding testimony concerning whether the victim was under the influence of drugs at the time he was shot; and

4) whether the trial court erred in excluding testimony concerning powder residue tests done on a weapon which was not the murder weapon.

The facts which support the jury's determination of guilt are as follows. At about 1:30 a.m. on February 6, 1983, Appellant's next-door neighbors heard a rapid series of gunshots coming from Appellant's premises. They phoned police. A police car arrived at Appellant's home, and a police officer saw Appellant through the front window. Appellant was putting on a shoulder holster containing a .357 magnum pistol. When Appellant realized the police were there, he fled out the back door, but was apprehended in his back yard.

Appellant claimed there was a man in his garage armed and perhaps injured. A police SWAT unit was called to the scene. After the garage was gassed, the police entered and discovered the victim's body. Appellant told the police that during an argument with the victim, the victim began throwing objects at Appellant, so Appellant "cranked off a few rounds" and then ran off. An autopsy revealed the victim was shot four times and bled to death. All of the bullets had entered the victim's body from the back.

At trial, Appellant claimed the victim threatened to kill him. When the victim reached down to his boot, Appellant thought the victim was reaching for a gun, so Appellant shot in self-defense. However, no pistol was found by the police.

I

When we are asked to review a trial court's decision to refuse giving a tendered instruction, three tests must be applied: (1) is the tendered instruction a correct statement of the law; (2) is there evidence in the record to support giving the instruction; and (3) is the substance of the tendered instruction covered by other given instruc-

tions. *Davis v. State* (1976), 265 Ind. 476, 478, 355 N.E.2d 836, 838. Instructions must be considered together as a whole and with reference to each other. *Bixler v. State* (1984), Ind., 471 N.E.2d 1093, 1101, *cert. denied,* — U.S. —, 106 S.Ct. 106, 88 L.Ed.2d 86. Giving and refusing to give instructions lies largely within the trial court's discretion. *Grossenbacher v. State* (1984), Ind., 468 N.E.2d 1056, 1059.

■ Appellant's tendered final instruction 2 concerned self-defense. The trial court refused to give the instruction, but gave six (6) other instructions on self-defense, three (3) of which Appellant submitted. Although tendered instruction 2 was a correct statement of the law, the substance of the instruction was covered by the six (6) other instructions given on self-defense. The trial court did not abuse its discretion in refusing to give Appellant's tendered instruction 2 because self-defense was adequately covered by the other instructions. Appellant's instruction 2 was simply redundant.

■ Appellant's tendered final instruction 3 concerned voluntary manslaughter as a lesser included offense to murder. The trial court refused to give Appellant's instruction 3, but gave its own instruction on voluntary manslaughter. The court's instruction on voluntary manslaughter, instruction C–11, is a more complete instruction than Appellant's tendered instruction, and thus, the trial court correctly refused to give Appellant's because it was an incomplete statement of the law. There is no error here.

■ Appellant's tendered final instruction 4 concerned viewing the circumstances through the eyes of the defendant to determine if his action was reasonable. The substance of this instruction was covered by Appellant's final instructions 5 and 6, which were read to the jury. We find that the substance of tendered instruction 4 was adequately covered by Appellant's other instructions, and the trial court did not err in refusing to read instruction 4 to the jury.

The trial court refused to give Appellant's tendered final instructions 7 which dealt with the reasonableness of one's action based on apparent or actual danger. The substance of this instruction also was covered in Appellant's final instructions 5 and 6. The trial court properly refused tendered instruction 7 because it was redundant.

■ Appellant's tendered final instruction 8 also was refused by the trial court. That instruction read as follows:

"The crime of Murder, as charged in the information, necessarily includes certain lesser offenses.

Regarding the charge of Murder, and all included offenses, the asserted defense of self-defense if not disproven beyond a reasonable doubt by the State, justifies the actions of the Defendant."

Not only is this instruction worded in a confusing manner, other instructions given on this subject matter were clearer. The jury was informed that they should find Appellant not guilty if they believed he acted in self-defense. They were informed that the State had the burden of proving Appellant did not act in self-defense. They were also informed that voluntary manslaughter is a lesser included crime for the charge of murder. Appellant's instruction 8 is both confusing and redundant, and the trial court properly refused it.

■ Appellant's tendered final instruction 9 concerned involuntary manslaughter as a lesser included offense to murder. The trial court refused to give any instructions as to involuntary manslaughter because there was no evidence to support such an instruction. The victim suffered four gunshot wounds to his back. Appellant admitted firing these shots in rapid succession. His assertion that this was only a battery is unfounded. The trial court correctly refused to instruct the jury on involuntary manslaughter.

## II

■ Appellant claims the trial court erred in giving some instructions that he claims were not supported by the law, or were incorrect statements of the law. In reviewing such claims, we apply the same

three tests as discussed in Issue I; (1) is the instruction a correct statement of the law, (2) is there evidence in the record to support giving the instruction, and (3) is the substance of the tendered instruction covered by other instructions. *Davis, supra.* Instructions will be considered as a whole, and the giving of the instruction lies largely within the trial court's discretion. *Bixler, supra; Grossenbacher, supra.*

Appellant objected to the trial court giving State's final instruction 4 which reads:

"A defendant, who anticipates that the victim intends to kill him or cause him serious bodily injury, if and when the opportunity presents itself, is not justified in using deadly force against the victim until the victim performs some act indicating that the attack is imminent."

Essentially this is a correct statement of the law. We have held that threats alone are not sufficient to justify the use of deadly force under a claim of self-defense. *DeBoor v. State* (1962), 243 Ind. 87, 92, 182 N.E.2d 250, 253, *cert. denied,* 371 U.S. 848, 83 S.Ct. 83, 9 L.Ed.2d 83. Since mere threats are not sufficient to invoke self-defense, it follows that there must be some act on the part of the decedent which gives rise to the requisite apprehension that attack is imminent. Here, Appellant claimed the victim threatened to kill Appellant, and started to reach for a gun in his boot. This evidence supports the trial court's decision to give State's final instruction 4 because there was a question as to whether the victim's actions indicated imminent attack. The instruction was a correct statement of the law, and was supported by the evidence.

■ Appellant also objected to State's final instruction 9 which concerned the use of force to protect one's self from attack. The instruction is a correct statement of the law because it is worded according to Ind.Code § 35–41–3–2(a) and (d)(3) (Burns 1985). Appellant objected to the instruction because it states that if a person enters into combat, or is the initial aggressor, he is not justified in using force unless he first withdraws, and communicates this to the other person, and the other person con-

tinues the attack. Appellant claims there was no evidence that he was the initial aggressor, or that he and the victim engaged in combat. This is not the case. Appellant admitted he and the victim got into a heated argument and the victim made threats to kill Appellant. The victim allegedly threw things at Appellant when he entered the garage, but the police did not find the objects Appellant claimed the victim threw at him. It was proper for the trial court to instruct the jury that if Appellant was the initial aggressor, or an equal combatant, he was not justified in using deadly force unless he first withdrew, and communicated this to the victim. The jury was ultimately to decide this issue of fact, and State's final instruction 9 correctly informed them of the law.

■ Finally, Appellant objected to the trial court's instruction C–11, which concerned voluntary manslaughter. Appellant objected that the instruction appeared to place the burden of proving sudden heat on him, and that the instruction was an incorrect statement of the law because the jury never was instructed that self-defense applies to lesser included offenses of murder. Appellant now argues in his brief that instruction C–11 is a misstatement of the law on other grounds. He claims it was improper to state that a response to provocation must be reasonable. Appellant has waived any error here because he is raising an argument on appeal different than the one he interposed at trial. *Survance v. State* (1984), Ind., 465 N.E.2d 1076, 1084.

### III

■ Appellant claims the trial court erred in preventing him from offering evidence concerning drugs found in the victim's body. Dr. Rachut, a pathologist, had performed the autopsy, and included in his report, and in a deposition, that certain drugs were found in the victim's body. At the beginning of trial, the State filed a motion *in limine* asking that testimony on the use of drugs by several of the witnesses, and testimony on the presence of drugs in the victim's body, be excluded from evidence *in limine.* This motion was granted

without objection or comment by Appellant. The record shows that Appellant made no attempt during Dr. Rachut's testimony to question him or in any way put in evidence the fact that drugs were found in the victim's body. His sole claim of exclusion of this evidence is based on the trial court's granting the State's motion *in limine* at the beginning of trial. This presents no issue for our review.

An order *in limine* is not a final determination of the admissibility of the evidence referred to in the motion. *Akins v. State* (1981), 429 N.E.2d 232, 237. In *McCraney v. State* (1981), Ind., 425 N.E.2d 151, we held that where prior to trial on charge of murder, the State filed a motion *in limine* to prevent the defendant from mentioning a pending rape charge against a prosecution witness in front of the jury and the record contained no ruling upon that motion, and the defendant made no attempt at any point in the examination of the prosecution witness to offer evidence of the pending rape charge, any alleged error in the trial court's refusal to allow the defendant to elicit evidence concerning the rape charge pending against the witness was not available for review. *Id.* at 152. There is no error here.

Appellant further claims the trial court erred in not allowing the jury to take the autopsy report, which was placed in evidence as Appellant's Exhibit A, into the jury room with them during deliberations. This report would have furnished the jury with the findings of the pathologist with regard to drugs in the body of the victim. The record shows, however, that Exhibit A was placed into evidence over the State's objection solely for the purpose of using it in examining the witness with the express statement that it would not be shown to the jury in its entirety. Furthermore, Appellant made no objection to this until after the jury had been excused for its deliberations and Appellant then argued he should have been able to make final argument with regard to drugs in the victim's body and have the jury view the autopsy report to indicate these facts. This issue was not presented to the jury nor was any attempt made to do so during trial. The court therefore did not err in refusing to send this report to the jury room during deliberations.

IV

Appellant's final contention is that the trial court erred in refusing to let him question his own expert witness, Stuart James, concerning certain ballistic tests James had performed. Appellant claims this denial prevented him from putting on a defense to refute the State's theory of the case.

During the State's case in chief, Dr. Rachut, who performed the autopsy on the victim, testified about one of the wounds the victim suffered, referred to as wound G. He testified that the bullet which caused wound G entered the victim's back from a low angle, and traversed in an upward path into the body. The victim's other wounds were caused by bullets which entered the victim's back but did not traverse either upward or downward. As a result, Dr. Rachut concluded that these other wounds were caused by bullets which entered the victim's body while he was standing upright. As to wound G, Dr. Rachut made two assumptions about how the bullet entered the victim's body: A) while he was standing with his back to Appellant and bending over and away from Appellant, or B) while he was lying prone on the floor with Appellant standing behind and over the victim. Dr. Rachut felt either of these assumptions would explain the angle at which the bullet causing wound G traversed the victim's body. He felt, however, that assumption B was more likely. He also testified that no powder residue was found on the victim, and was of the opinion that a weapon such as the murder weapon here would leave powder residue if fired less than 24 inches from the victim's body.

Appellant's version of the facts supported assumption A. He claimed he shot the victim in self-defense when the victim reached for what Appellant thought was a gun contained in the victim's boot. Thus he sought to show by expert testimony that

a .357 magnum handgun would leave powder residue if fired less than 54 inches from the target. Appellant's theory is that if no powder residue was found on the victim, and that if a .357 magnum leaves powder residue if fired less than 54 inches from the target, then it is more likely Appellant was standing more than 54 inches from the victim's body when Appellant fired the shot that caused wound G. He claims this evidence refutes Dr. Rachut's assumption B; that wound G was more likely caused by someone standing behind and over the victim and shooting the victim in the back as he lay on the floor.

The trial court sustained the State's objection to the expert's testimony concerning powder residue tests he performed on a .357 magnum handgun which was not the murder weapon. The trial court relied on *Miller v. State* (1968), 250 Ind. 656, 236 N.E.2d 585, a case where we dealt with the issue of powder residue experiments conducted on a weapon different than the murder weapon. In that case, we recognized several factors to be considered before allowing testimony from an expert about powder residue tests for the purpose of showing the distance between the gun barrel and the target. The factors are: 1) whether the murder weapon is used to conduct the tests; 2) if a "similar" weapon is used, whether it is in the same relative condition as the murder weapon; 3) whether the same make and grade of ammunition is used; and 4) whether the conditions prevailing at the experiment were substantially similar to those at the time of the homicide. *Miller* at 660, 236 N.E.2d at 587–588. In weighing these factors, as with all evidentiary rulings, the trial court has wide latitude in ruling on the relevancy and admissibility of the evidence. *See Jenkins v. State* (1985), Ind., 485 N.E.2d 625, 626; *Grimes v. State* (1983), Ind., 450 N.E.2d 512.

The expert witness, Stuart James, stated in Appellant's offer to prove, that he (Stuart) conducted a series of tests with a .357 magnum which was the identical model and in a "similar" condition as the murder weapon. He shot the gun at pieces of cloth similar to that worn by the victim from a distance of 6 inches to 72 inches, in increments of 6 inches. He stated the ammunition used was the same type as that which killed the victim, and that there was only one grade of powder load produced by the manufacturer for this type of ammunition. He concluded that powder residue traces could be detected up to 54 inches from the gun barrel to the cloth material. He also stated there could be a variation of up to 24 inches on either side of the 54 inch measure, depending on the gun used, but that he would not expect that great a difference given the similarities between the gun used in the test and the murder weapon. Given all this, we cannot say the trial court clearly abused its discretion in prohibiting Appellant's expert witness from testifying about the powder residue tests he performed.

The expert's offered testimony would not have added or detracted anything of substance from the testimony of Dr. Rachut. He testified that either of two possible assumptions could be made as to how wound G was inflicted. That a gun similar to the murder weapon leaves powder residue traces at a distance up to 54 inches from the target does not tend to prove nor disprove either of Dr. Rachut's assumptions. Appellant could have been standing over and behind the victim, but more than 54 inches away when he fired the shot that caused wound G, or he could have been standing at the other end of the garage when he fired the shot in question. Either way, there would have been no powder residue traces on the victim's clothing. The only relevance the expert's testimony tended to have was to dispute Dr. Rachut's opinion that a .357 magnum would leave powder residue traces up to a distance of 24 inches. This, however, was not a material issue in the trial. In our view, the trial court did not abuse its discretion in preventing Appellant's expert to testify concerning the powder residue tests.

Finding no reversible error on any of these issues, we affirm the trial court.

SHEPARD, C.J., and DeBRULER and GIVAN, JJ., concur.

DICKSON, J., concurs in result without separate opinion.