United States Court of Appeals
FOR THE EIGHTH CIRCUIT

_____

No. 96-4245

_____

Michael Wayne Dean,                            *
                                               *
                Appellee,                      *
                                               *   Appeal from the United States
        v.                                     *   District Court for the
                                               *   Western District of Arkansas.
Pascual Q. Olibas, doing business as           *
Freedom Bail Bonds,                            *
                                               *
                Appellant.                     *

_____

Submitted: September 11, 1997
      Filed:  November 19, 1997

_____

Before BOWMAN, Circuit Judge, HENLEY, Senior Circuit Judge[1], and MORRIS
     SHEPPARD ARNOLD, Circuit Judge.

_____

BOWMAN, Circuit Judge.

    A man was arrested for driving while intoxicated in Ward County, Texas, on
February 12, 1994. He convinced the police that he was Michael Wayne Dean. He
also convinced a bail bonding company operated by the defendant, Pascual Olibas.

_____

    [1] Judge Henley died on October 18, 1997. This opinion is consistent with his
vote at the panel's conference following oral argument of the case on September 11,
1997.

The company posted a $1,500 bond to secure "Michael Dean's" release from jail. Regrettably, the man turned out not to be who he claimed.

The man was probably Michael Dean's brother, Lee Dean Jr. He failed to appear in court at his hearing on the DWI charge. Ward County then instituted proceedings against Olibas to collect on the $1,500 bond, prompting Olibas to begin searching for Michael Dean. Michael Dean, the plaintiff in this case, contends that at some point in his search Olibas learned that he was not the man who had been arrested for the DWI. Olibas denies this. In any event, Olibas eventually located Dean in Arkansas and filed an Affidavit of Intention to Surrender Accused, naming Dean as the accused, with an Arkansas court. The Arkansas police then arrested Dean pursuant to a warrant that was based on Olibas's affidavit. The charges against Dean were later dismissed.

Dean subsequently brought this suit against Olibas for causing his arrest, claiming malicious prosecution, false imprisonment, and violation of his civil rights. Dean filed suit in Arkansas state court, and the case was removed to federal court on the basis of diversity of citizenship. It was tried before a jury, which found Olibas liable on each of the three claims and awarded Dean $5,000 in compensatory damages and $70,000 in punitive damages. The District Court entered judgment in accordance with the jury's determinations and also awarded Dean $18,556.25 in attorney fees and $1,011.17 in costs. Olibas now appeals. We affirm in part and reverse in part.

Olibas's first contention is that the District Court incorrectly denied his motion to dismiss the suit for lack of personal jurisdiction. Olibas, a citizen of Texas, maintains that the District Court in Arkansas had no jurisdiction over him because he had insufficient contacts with that state. We review rulings on questions of personal jurisdiction de novo. Burlington Indus., Inc. v. Maples Indus., 97 F.3d 1100, 1102 (8th Cir. 1996). Under Federal Rule of Civil Procedure 4(k)(1)(A), in a diversity action a federal district court has personal jurisdiction to the same extent as a state court of the state in which it sits (unless some other federal rule applies, but none does here). The

jurisdiction of Arkansas courts is governed by the Arkansas long-arm statute, which, at the time Dean filed his claim,[2] stated that "[a] court may exercise personal jurisdiction over a person . . . as to a (cause of action) (claim for relief) arising from the person's: (a) Transacting any business in this state." Ark. Code Ann. § 16-4-101(C)(1)(a) (Michie 1994). The Supreme Court of Arkansas has held that the purpose of this provision "is to permit Arkansas courts to exercise the maximum in personam jurisdiction allowable by due process." Szalay v. Handcock, 819 S.W.2d 684, 686 (Ark. 1991). Accordingly, we must determine whether jurisdiction over Olibas was consistent with due process.

Due process requires that the defendant have "minimum contacts" with the forum "such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." International Shoe Co. v. Washington, 326 U.S. 310, 316 (1945) (internal quotation marks omitted). This standard is met where "the defendant has purposely directed its activities at forum residents, and the litigation results from injuries arising out of, or relating to, those activities." Burlington Indus., 97 F.3d at 1103; see also Burger King Corp. v. Rudzewicz, 471 U.S. 462, 472 (1985). In this case, Olibas purposely directed his activities at Michael Dean and Arkansas in several ways. He made numerous phone calls to Arkansas while trying to locate Dean. He made a personal visit to Arkansas in his attempt to track Dean down. Most important, Olibas submitted to an Arkansas court an Affidavit of Intention to Surrender Accused that requested Dean's arrest. This led directly to Dean's arrest, which led directly to

[2] Dean filed his claim on February 13, 1995. On February 28, 1995, Arkansas amended its long-arm statute to state that its courts have personal jurisdiction "to the maximum extent permitted by the due process of law clause of the Fourteenth Amendment of the United States Constitution." Ark. Code Ann. § 16-4-101 (Michie Supp. 1995). We assume without deciding the question that the prior version governed in this case because it was the law when Olibas filed his claim (no Arkansas court has considered this issue). Even if the second version governed, our analysis would be the same: under both versions of the statute the question is whether jurisdiction over Olibas satisfied due process.

the present litigation.  In sum, Olibas intentionally made many contacts with Arkansas in his pursuit of Dean, and those contacts caused this lawsuit.  The District Court properly exercised jurisdiction over him.

Olibas next argues that the District Court wrongly denied his motion for judgment as a matter of law on each of the three claims.  We review the denial of a motion for judgment as a matter of law de novo.  Haynes v. Bee-Line Trucking Co., 80 F.3d 1235, 1238 (8th Cir. 1996).  A party should be granted judgment as a matter of law only if no reasonable jury could find against him.  Fed. R. Civ. P. 50(a)(1).  We  will address each claim in turn.

Malicious Prosecution:  Under Arkansas law, a plaintiff claiming to have suffered malicious prosecution must prove: "(1) a proceeding instituted or continued by the defendant against the plaintiff; (2) termination of the proceeding in favor of the plaintiff; (3) absence of probable cause for the proceeding; (4) malice on the part of the defendant; and (5) damages."  Harmon v. Carco Carriage Corp., 895 S.W.2d 938, 939 (Ark. 1995).  Olibas contends that he is entitled to judgment as a matter of law on this claim because no reasonable jury could find that he lacked probable cause to initiate proceedings against Dean.  He asserts that he unquestionably had probable cause because charges were pending against Michael Dean and a warrant had been issued for his arrest.  To assess the merit of Olibas's argument, we must examine the meaning of probable cause under Arkansas law.

The Supreme Court of Arkansas defines probable cause as "a state of facts or credible information which would induce an ordinarily cautious person to believe that the accused is guilty of the crimes charged."  Id.  That court has explained that ordinary caution is "a standard of reasonableness which presents an issue for the jury when the proof is in dispute or subject to different interpretations."  Cox v. McLaughlin, 867 S.W.2d 460, 464 (Ark. 1993) (internal quotation marks omitted).  In this case the jury reasonably could have found that an ordinarily cautious person in Olibas's position

-4-

would have thought that Michael Dean was not guilty. Indeed, the jury reasonably could have found that Olibas actually knew that Dean was innocent. Dean's father testified that Olibas told him Dean was not the man he sought. Dean's stepmother testified that Olibas told her exactly the same thing. In light of this evidence, we conclude that the jury acted reasonably in finding that Olibas did not have probable cause to arrest Dean. The judgment of liability for malicious prosecution is affirmed.

False Imprisonment: False imprisonment is "the unlawful violation of the personal liberty of another consisting of detention without sufficient legal authority." Headrick v. Wal-Mart Stores, Inc., 738 S.W.2d 418, 420 (Ark. 1987). Olibas argues that he is shielded from liability for false imprisonment because Dean was arrested pursuant to a valid warrant. His position is supported by Arkansas law. The Supreme Court of Arkansas has held that "'[o]ne who instigates or participates in a lawful arrest, as for example an arrest made under a properly issued warrant by an officer charged with the duty of enforcing it, may become liable for malicious prosecution, . . . or for abuse of process, . . . but he is not liable for false imprisonment.'" Id. (quoting the Restatement (Second) of Torts § 45A cmt. b (1965)).[3] This principle applies even where the person instigating the arrest does so maliciously. See Campbell v. Hyde, 122 S.W. 99, 101 (Ark. 1909). Because Dean was arrested pursuant to a properly issued warrant, Olibas is not liable for false imprisonment for causing his arrest. The judgment on this claim is reversed.

---

[3] Dean cites Grandjean v. Grandjean, 869 S.W.2d 709 (Ark. 1994), in which the court upheld a verdict of liability for false imprisonment where the defendant had knowingly given false information to a prosecutor in order to procure warrants for the plaintiffs' arrests and the plaintiffs were then arrested pursuant to those properly issued warrants. See id. at 710. The court in Grandjean, however, did not affirm the judgment on its merits; it declined to consider the defendant's argument because he had not properly preserved it in the trial court. See id. at 711-12. Grandjean thus did not change Arkansas's law on false imprisonment.

Violation of Civil Rights: The Arkansas Civil Rights Act of 1993 provides that a person who, acting under color of law, deprives another of rights secured by the Arkansas Constitution shall be liable to the person whose rights he violates. See Ark. Code Ann. § 16-123-105(a) (Michie Supp. 1995). Olibas contends that he was not acting under color of law when he filed the affidavit that led to Dean's arrest. The Arkansas Civil Rights Act states that a court applying it may look to federal decisions interpreting 42 U.S.C. § 1983, "which decisions and act shall have persuasive authority only." Ark. Code Ann. § 16-123-105(c). No Arkansas court has yet construed the Arkansas act, so we shall be persuaded by federal law.

To occur under color of law, conduct causing the deprivation of a civil right must be "fairly attributable to the State." Lugar v. Edmondson Oil Co., 457 U.S. 922, 937 (1982). The Supreme Court has set forth a two-part test for analyzing whether conduct fits that description. We first must ask "whether the claimed constitutional deprivation resulted from the exercise of a right or privilege having its source in state authority," and if so we then determine if "the private party charged with the deprivation could be described in all fairness as a state actor." Edmonson v. Leesville Concrete Co., 500 U.S. 614, 620 (1991). In this case the answer to the first question is yes. When Olibas filed his Affidavit of Intention to Surrender Accused with an Arkansas court, he exercised a right--the right to have fugitives arrested--having its source in state authority--the Uniform Criminal Extradition Act, Ark. Code Ann. § 16-94-213 (Michie 1987). The sole remaining question is thus whether Olibas was a state actor.

In addressing this question in Edmonson, the Supreme Court stated that "in determining whether a particular action or course of conduct is [state action], it is relevant to examine the following: the extent to which the actor relies on governmental assistance and benefits; whether the actor is performing a traditional governmental function; and whether the incident is aggravated in a unique way by the incidents of governmental authority." 500 U.S. at 621-22 (citations omitted). In this case Olibas's alleged state action consisted of filing an affidavit that led to Dean's arrest. Providing

information about a criminal suspect to law enforcement is not a traditional governmental function; it is something that private citizens do every day. Olibas did not rely on governmental assistance or benefits in filing the affidavit; he filed it on his own and of his own free will, without the aid or encouragement of the state. In short, Olibas filed the affidavit as a private citizen, as any private citizen could. See Ark. Code Ann. § 16-94-213 (authorizing "any credible person" to file an affidavit requesting a fugitive's arrest). We hold that Olibas's conduct did not constitute state action.

This conclusion is supported by other cases in which bail bondsmen have caused a fugitive's arrest. In Landry v. A-Able Bonding, Inc., 75 F.3d 200, 204-05 (5th Cir. 1996), the Fifth Circuit held that a bail bondsman who performed a citizen's arrest of a fugitive was not a state actor because he did not act pursuant to a warrant and did not enlist the aid of the police in effecting the arrest. See also Ouzts v. Maryland Nat'l Ins. Co., 505 F.2d 547, 553 (9th Cir. 1974), cert. denied, 421 U.S. 949 (1975) (holding that the bondsman who performed a citizen's arrest was not a state actor since he did not act pursuant to state law); Curtis v. Peerless Ins. Co., 299 F.Supp. 429, 434 (D. Minn. 1969) (holding that private parties who arrested fugitive on whose bond they were sureties were not state actors).[4] In this case it is even more clear that no state action occurred. Unlike the defendants in the cases cited above, Olibas did not personally arrest Dean (a traditional government function). Instead he merely provided the state information that led to Dean's arrest (a traditional action of private citizens). We conclude that Olibas was not a state actor and therefore was entitled to judgment as a

---

[4] Contrary to these cases, the Fourth Circuit has stated that bail bondsmen are state actors because of their "symbiotic relationship" with the state. See Jackson v. Pantazes, 810 F.2d 426, 430 (4th Cir. 1987). We reject this position, as did the Fifth Circuit in Landry and the Ninth Circuit in Ouzts. See Landry, 75 F.3d at 205 n.5; Ouzts, 505 F.2d at 554-55. As a general matter, bondsmen are private citizens who interact with the state in the course of pursuing their private interests. Their conduct is therefore not attributable to the state. See Ouzts, 505 F.2d at 554-55.

matter of law on the claim of violating Dean's civil rights. The judgment on that claim is reversed.

Because we reverse the judgment of liability on the civil rights claim, we also must vacate the award of $18,556.25 in attorney fees, which was based on that claim.[5] Because we affirm the judgment on the malicious prosecution claim, we affirm the award of compensatory damages in the sum of $5,000. We affirm the award despite reversing two of the three judgments because the jury did not base the award on any particular one of the three claims. Dean's damages, and Olibas's conduct that caused them, are the same regardless of what legal theory entitles Dean to recovery. See Lowe v. Hart, 125 S.W. 1030, 1034 (Ark. 1910) (holding that the plaintiff need only prevail on one of two legal theories based on the same set of facts in order fully to recover). For the same reason, we will also affirm the award of $70,000 in punitive damages, unless it violates the Constitution. This is Olibas's final argument, to which we now turn.

Olibas argues that the award of $70,000 in punitive damages was unconstitutionally excessive and that the District Court therefore erred in denying his motion for remittitur. The due process clause of the Fourteenth Amendment prohibits the imposition of "grossly excessive" punitive damages. BMW of N. Am. v. Gore, 116 S. Ct. 1589, 1592 (1996) (quoting TXO Prod. Corp. v. Alliance Resources Corp., 509 U.S. 443, 454 (1993) (plurality opinion)). The Supreme Court has declined to establish a single test for determining whether an award of punitive damages violates the Constitution. See BMW, 116 S. Ct. at 1604. The Court has, however, articulated

_____

[5] The District Court awarded Dean attorney fees in accordance with section 105(b) of the Arkansas Civil Rights Act, Ark. Code Ann. § 16-123-105(b), which authorizes assessing such fees against a party who violates the act. The District Court was careful to avoid awarding Dean attorney fees for work his lawyer performed that was unrelated to the civil rights claim.

several factors relevant to this determination. Our consideration of these factors leads us to uphold the award in this case.

First, the Supreme Court has stated that "a judgment that is a product of [fair procedures] is entitled to a strong presumption of validity." TXO, 509 U.S. at 457; see also Pacific Mut. Life Ins. Co. v. Haslip, 499 U.S. 1, 19-23 (1991) (finding award of punitive damages constitutional in part because it was rendered and upheld in fair proceedings). Most of the procedures mentioned in TXO and Haslip as contributing to the presumptive validity of an award were present in this case. The jurors were selected as impartial; they heard all the evidence presented by both sides; the district judge properly instructed them on the law; and the judge upheld the award after considering its constitutionality. Indeed, Olibas does not argue that the procedures in the District Court were unfair. Accordingly, we begin our review of the legality of this award with the presumption that it is constitutional.

In BMW, the Supreme Court held that "[p]erhaps the most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct." 116 S. Ct. at 1599. Olibas's conduct had some of the characteristics that justify the imposition of substantial punitive damages. Most important, his misconduct was intentional: he had Dean arrested for a crime he knew Dean did not commit, so that he could save himself $1500. In TXO and Haslip, in each of which the defendant was responsible for purposeful malfeasance, the Court upheld the punitive awards. See TXO, 509 U.S. at 453; Haslip, 499 U.S. at 14-15. In BMW, to the contrary, the Court based its reversal of the award partly on the absence from the record of "deliberate false statements" and "acts of affirmative misconduct." BMW, 116 S. Ct. at 1601. In addition, Olibas inflicted significant noneconomic harm on Dean. In BMW, the Court reversed the award partly because the plaintiff's harm was "purely economic." Id. at 1599. In this case Dean was eating dinner with his wife and children when police arrested him, took him to the police station, confiscated some of his property, and detained him for several hours against his will. He subsequentlywas

required to attend court hearings on two different days. In sum, the nature of Olibas's misconduct does not require us to conclude that the punitive damages assessed against him were unconstitutional.

The Court held in BMW that "[t]he second and perhaps most commonly cited indicium of an unreasonable or excessive punitive damages award is its ratio to the actual harm inflicted on the plaintiff." 116 S. Ct. at 1601. Olibas argues that the punitive damages assessed against him were out of proportion to Dean's harm. Dean was awarded $5,000 in compensatory damages and $70,000 in punitives, so the ratio of punitive damages to actual harm was fourteen to one. This ratio is indeed high. See Haslip, 499 U.S. at 23-24 (finding that punitive damages over four times the amount of compensatory damages were "close to the line" but nevertheless constitutional). The Court, however, has "consistently rejected the notion that the constitutional line is marked by a simple mathematical formula." BMW, 116 S. Ct. at 1602. In fact, in TXO the Court upheld punitive damages over 526 times the size of the actual damages. See 509 U.S. at 459-62. Indeed, the Court has stated that high punitive damages may properly accompany low compensatory damages in cases where the plaintiff's harm is primarily noneconomic and it is thus difficult to assign a monetary value to that harm. See id. That was certainly true in this case, where Dean's financial harm was minimal but his emotional damage great. Moreover, in imposing punitive damages it is proper to consider not only the harm that actually resulted from the defendant's misdeeds but also the harm that might have resulted. Id. This includes "the possible harm to other victims that might have resulted if similar future behavior were not deterred." TXO, 509 U.S. at 460. In this case Dean might have suffered more harm than he in fact did, if, for instance, he had been unable quickly to persuade the police that he was not the man they sought. The potential harm to future victims also was significant; as the operator of a bail bonding business, Olibas may have other opportunities knowingly to initiate the arrest of innocent people. In conclusion, while the ratio of punitive to actual damages in this case was high, that is not enough to convince us that the punitive damages, which punished Olibas's intentional misconduct and were imposed in a trial

-10-

in which all requisite procedural safeguards were employed, were so grossly excessive as to violate due process. The award of punitive damages was within the limits the Constitution imposes.

In summary, we find that the District Court did have jurisdiction over Olibas. We affirm the judgment on the malicious prosecution claim and therefore affirm the award of compensatory damages and the award of punitive damages, which we find to be constitutional. We reverse the judgment of liability on the claim of false imprisonment, which does not affect the award. We also reverse the judgment on the civil rights claim, and we therefore vacate the award of attorney fees.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.