**MICHIGAN MUTUAL INSURANCE COMPANY, Appellant– Defendant,**

v.

**SPORTS, INC., d/b/a Imperial Lanes of Sports, Inc., Appellee–Plaintiff.**

No. 84A04–9707–CV–314.

Court of Appeals of Indiana.

Aug. 27, 1998.

Michael A. Wilkins, Ice, Miller, Donadio & Ryan, Indianapolis, Gary R. Chopp, Jeffrey R. Learned, Morrison, Mahoney & Miller, Southfield, MI, for Appellant–Defendant.

Stephen L. Williams, John T. Roach, Mann Law Firm, Terre Haute, for Appellee–Plaintiff.

## OPINION

DARDEN, Judge.

### STATEMENT OF THE CASE

Michigan Mutual Insurance Company appeals the jury verdict in favor of Imperial Lanes of Sports, Inc. We affirm.

### ISSUES

1. Whether the trial court erred in instructing the jury.

2. Whether the punitive damage award violates due process.

### FACTS

Beginning in the 1970's, Imperial Lanes, Inc. owned a bowling alley in Terre Haute. One of the long-time shareholders was Pierre

Miller. Miller had been a chartered property casualty underwriter (CPCU) since 1955 and had operated his own Terre Haute insurance agency since 1964. In the late 1980's, he was president of Imperial Lanes, Inc, held 20% of the shares, and acted as the conduit for communication between the shareholders and staff operating the lanes. In 1989, Imperial Lanes, Inc., with aging shareholders and facing an oncoming tripling of the bowling alley's land lease expense, began seeking a buyer.

Miller's agency, as part of its approximately 60% commercial property insurance business, obtained insurance for the bowling alley from Michigan Mutual Insurance Company in 1987. After Miller ceased being an agent for Michigan Mutual in 1989, he coordinated continued coverage for the bowling alley from Michigan Mutual through his colleague Boyd Hopper at Hopper's insurance agency. The last such coverage was for the period of November 1, 1990, to November 1, 1991.

Ray Goddard had owned and operated a golf course in Terre Haute for several years. Goddard's sister was married to Pierre Miller, and Goddard became interested in the bowling alley as a business whose winter season would complement the timing of his golf business. Goddard's long time manager at the golf course, Denise Wooden, and her brother Rick Purcell, joined with Goddard to form Sports, Inc., d/b/a Imperial Lanes of Sports, Inc., which purchased the bowling alley building and assets effective May 1, 1991. All the new owners had business management experience and were financially secure. After the sale, Mrs. Wooden's husband, Kenneth, began managing the bowling alley, and Mrs. Wooden was there every day assisting with various matters. All personnel of the bowling alley under the previous owners continued to be employed by the new owners, and Pierre Miller acted as a consultant to the new owners.

Goddard had obtained personal and business insurance coverage from Miller's agency

for over twenty years; Mrs. Wooden, her personal insurance from the agency for ten years. Before the sale, both discussed with Miller's agency the desire for coverage like that in place on the bowling alley. They asked Miller to procure coverage for the bowling alley. Miller prepared and signed a computer generated binder, dated April 29, 1991, which indicated the existing Michigan Mutual policy (# MGCPP0212939), with identical limits, was extended to cover the bowling alley at the Terre Haute address for Imperial Lanes of Sports, Inc. during the period of May 1 to June 1, 1991. The day of closing on the sale, Goddard and Mrs. Wooden specifically queried the Miller agency as to whether the alley was "properly covered" and were so assured. That same day Miller sent the bowling alley its copy of the binder.

On May 10, 1991, Miller called Hopper's agency and, because Hopper was out of town, talked with Donna King[1] there. Miller advised King that the bowling alley had been sold, he had issued a binder, there was "a new owner," and the Hopper agency should take necessary steps "to keep the coverage in full force." (R. 613, 614). She agreed to so inform Mr. Hopper and indicated she saw "no problem." (R. 614). Miller also asked that worker's compensation coverage be procured for the bowling alley. When Hopper returned, Miller talked with him about these same matters, and Hopper expressed no concerns about being able to continue the coverage. Miller sent a note verifying this conversation, along with the binder, to Hopper. Upon receipt of the binder, the Hopper agency forwarded it to Michigan Mutual.[2]

On May 31, 1991, King prepared, signed, and mailed to Michigan Mutual a "request for policy change" asking that the "insured's name" on policy # MGCPP0212939 be changed to Imperial Lanes of Sports, Inc. (R. 550).[3] Also on May 31st, Miller prepared a second binder for coverage from June 1st to July 1st, and sent it to Hopper.

---

**1.** King was a licensed Indiana insurance agent and an authorized agent of Michigan Mutual.

**2.** The Hopper agency forwarded it to Michigan Mutual on May 24th.

**3.** That same day she also sent Michigan Mutual an application for worker's compensation insurance on behalf of Imperial Lanes of Sports, Inc.

The next evening, Saturday, June 1, 1991, a fire damaged the bowling alley.

On June 3rd, King learned about the bowling alley fire and faxed a notice of loss to Michigan Mutual.[4] On June 4th, she received the second binder, signed it, and mailed it to Michigan Mutual. That same day, an underwriting assistant from Michigan Mutual called King to ask for information on the new owners. The assistant informed King that the company had not received the binders, and asked that she send copies—which King did.[5] Also on June 4th, Richard Watson, an adjuster for IRM, the reinsurer for Michigan Mutual on policy # MGCPP0212939, arrived in Terre Haute to begin determining the scope of the loss at the bowling alley on behalf of Michigan Mutual. Watson returned to Terre Haute on June 7th. Before departing that day, he had most of the information necessary to adjust the claim. However, he also informed Mrs. Wooden on June 7th that Sports, Inc. might not be covered by the Michigan Mutual policy.

On June 19th, Warren Williams, Michigan Mutual's senior commercial underwriter, sent Hopper's agency a letter indicating the company was declining coverage because (1) it had exceeded its binding authority;[6] and (2) written consent for assignment or transfer of the policy was not obtained prior to issuance of the binder, and "from a financial or other standpoint" Michigan Mutual was unable to underwrite "this new risk." (R. 749). The next day, adjuster Watson, pursuant to instruction by IRM's counsel and with a copy of Williams' letter as guidance, wrote to Sports, Inc., stating that "no policy was ever written to cover [its] interest" in the bowling alley (R. 1671), and its claim for loss was denied.

Repairs to the bowling alley were initially stalled by these events. Then, as contractors proceeded with the work, liens were placed against the property. The shareholders took some loans to bridge the 2½ months the business was shut down. Sports, Inc. hired an attorney to press a claim for more than $389,000 against the insurance carrier for Forsythe Brothers, the electrical contractor responsible for the damaged extension cord which caused the fire.[7] At the end of 1991, Sports, Inc. received $300,000, the limits of the contractor's policy, from the insurance carrier. By that time, damages totaled $409,675.95.

Sports, Inc. brought an action against Michigan Mutual claiming the insurance company had breached its obligation of good faith and fair dealing and further seeking punitive damages for having done so.[8] The case was tried by jury over the course of seven days.

Williams, Michigan Mutual's senior underwriter, had underwritten the bowling alley coverage since 1987. Williams testified that he was aware of Miller's involvement in the bowling alley's insurance after Hopper became the Michigan Mutual agent on the account in 1989. Williams knew of the arrangement between Miller and Hopper to maintain the bowling alley's insurance and was aware that everything went through Hopper. He confirmed that despite Miller's name appearing on previous binders, the amount of the coverage,[9] and receipt of a binder by the company after its effective date, Michigan Mutual had continued to accept premiums and to insure the bowling

---

4. Michigan Mutual's policy was for requested changes to be sent by mail and loss reports to be sent by fax.

5. Neither of the binders initially sent to Michigan Mutual by King were in Michigan Mutual's files.

6. Hopper's "agency agreement" with Michigan Mutual stated that its binding authority was $500,000 per occurrence. (R. 868). Before the fire, coverage for Imperial Lanes, Inc. under policy # MGCPP0212939 was $550,000, and $550,000 was the amount sought on all submissions for Sports, Inc.

7. An investigator hired by adjuster Watson determined that the extension cord was the cause of the fire.

8. Sports, Inc. also named the Miller agency and the Hopper agency as defendants and pressed a claim of negligent procurement against each. The jury found in favor of these two defendants.

9. $550,000, when the binder limitation was $500,000.

alley. Williams also acknowledged that when an agent consents to provide coverage, as Hopper had done, a valid insurance contract arises, and the agent's representation binds the company. In 1990, the reinsurer (IRM) indicated its desire to renew coverage of the bowling alley, and Williams assessed the account as a "nice risk." (R. 965). Finally, Williams testified that when he wrote the letter saying coverage was denied because Michigan Mutual was unable to underwrite the risk from a financial standpoint, he had no financial information from Sports, Inc., to consider; however, had the new owners been equal or better on those factors which the company considers, he probably would have underwritten the account. The current regional manager for Michigan Mutual's business in Indiana, Bonnie Uber, confirmed that if an agent takes action to properly bind coverage for a loss, and "somehow the company was not notified until after the loss," coverage would be in place for that loss. (R. 1766).

Boyd Hopper testified that Sports, Inc. was insured by Michigan Mutual on June 1st for two reasons. Given the previous practice on the bowling alley's insurance, the two binders issued by Miller were effective until the company rejected them.[10] Further, King's signed application on May 31st for a change of name was effective until accepted or rejected by Michigan Mutual.[11]

The Michigan Mutual claims manual provided that where "all parties in good faith intended the coverage to be written and Company rules would have permitted its acceptance," and a technical error occurred in notifying the company, that situation deserves special consideration. (R. 1022). No such consideration was undertaken with respect to Sports, Inc., despite the unequivocal testimony of an intent to afford coverage on the part Miller, Hopper, and King,[12] and the belief that such coverage existed on the part of Sports, Inc.

Michael Barranco testified as an expert witness with thirty years of experience in the insurance industry and its claims handling practices. Based upon his background, his knowledge of insurance industry practice, and the review of Michigan Mutual's claims manual, Barranco expressed the following opinions. First, Barranco opined that Michigan Mutual's denial of the bowling alley's claim was unfounded and improper for several reasons. Sports, Inc. had insurance coverage under the binder dated May 31, 1991, under the name change application dated May 31, 1991, and pursuant to the terms of the company's claims manual. Further, Michigan Mutual, the Hopper agency and Miller had engaged in a "course of dealing" whereby the insurance company allowed its agents "to deviate from the strict language" of its agency agreement, thereby prohibiting the insurance company from "later com[ing] back and tak[ing] a different position." (R. 1329). In addition, Barranco found Michigan Mutual's denial of the bowling alley's claim to be unreasonable, unfounded, and improper by virtue of the existence of an effective binder and the course of dealing leading up to the issuance of that binder. Moreover, despite the rhetoric of its letter of June 19, 1991, Michigan Mutual had made no determination of insurability. He found a "clearly intentional failure to conduct a competent objective investigation into the issue of insurability." (R. 1348). Finally, Barranco opined that Michigan Mutual had failed to

---

**10.** According to Hopper, even if the company denies an application, thirty days notice thereof is required—during which thirty days the applicant is insured.

**11.** Underwriter Williams acknowledged that binders effect coverage until the risk is rejected or the company submits a change application at a different rate, and that Michigan Mutual normally gave thirty days of coverage on a binder.

**12.** Miller testified that he believed Sports, Inc. was covered because the procedure of his preparing the binder and forwarding it to Hopper had been accepted by Michigan Mutual in the past, and that if he thought there might be any sort of problem with procuring the insurance in that manner, "[w]e could have changed the date of the acquisition." (R. 424). Hopper testified that with his agency's action to inform Michigan Mutual, and the company's knowledge "from past experiences what was going on," the "intent on [his] part" and that of Miller was that "there was coverage." (R. 718). King testified that she signed the second binder and also submitted the application for a name change to protect Sports, Inc. and make sure they had insurance coverage.

comply with its claims manual requirement that claims not be refused "without conducting a reasonable investigation based on all information." (R. 1363). Specifically, Michigan Mutual failed to conduct an investigation into the course of dealing involved in the instant insurance policy.

Barranco also testified about how the purpose of punitive damages was to deter unacceptable company behavior. His review of Michigan Mutual's financial information indicated that the company had net assets of more than $219 million. Barranco suggested a punitive damages award of 2% of the net assets ($4,383,301.46) "would get the company's attention, but would not cripple or imperil the company." (R. 1372).

The jury returned a verdict for Imperial Lanes of Sports, Inc. and against Michigan Mutual, and awarded compensatory damages of $78,047.81 and punitive damages of $1,000,000.

## ISSUES

### 1. *Instructional Error*

■ The giving of jury instructions is within the discretion of the trial court. *Homehealth, Inc. v. NIPSCO*, 600 N.E.2d 970, 975 (Ind.Ct.App.1992). We review its decision only for an abuse of discretion. *Id.* Reversal based upon instructional error is warranted only when the trial court's instructions, *taken as a whole,* misstate the law or mislead the jury. *Koziol v. Vojvoda,* 662 N.E.2d 985, 991 (Ind.Ct.App.1996).

Before discussing Michigan Mutual's claims of instructional error, we make certain observations about the proceedings. The trial court's preliminary instructions extensively described Sports, Inc.'s claims in this case and briefly referred to Michigan Mutual's defenses.[13] The court's preliminary instructions also explained that the plaintiff bore the burden of proving its claims by a preponder-

ance of the evidence and told the jury that it was the sole judge of the evidence. A total of seventy requested final instructions were tendered to the trial court.[14] The court gave thirty, after indicating it would "only give general statements of the law." (R. 1924).

A. Michigan Mutual claims the trial court abused its discretion in instructing the jury as follows:

> A general agent of an insurer with authority to issue binders of insurance may orally bind the insurer. If you find that Boyd Hopper & Associates orally bound coverage, then a binding contract of insurance was entered into between the Plaintiffs and the Defendant, Michigan Mutual Insurance Company.

(R. 2261).

■ Michigan Mutual contends that Boyd Hopper and Associates ("Hopper") was a special agent having only limited powers and authority as set forth in the agency agreement[15] and that a special agent cannot orally bind its principal. Critical to this contention is its assertion that this position was argued to the trial court; Michigan Mutual so claims in its brief, citing certain statements by counsel at R. 1942–43, 1945. However, these statements of objection were directed toward the pattern jury instruction defining a general agent, which the trial court did not give. To the above instruction, Michigan Mutual objected solely that "there is no evidence in this case that anybody was acting as a general agent of any insurance company." (R. 2031). Michigan Mutual may not present on appeal an argument as to why an instruction is erroneous when that argument with respect to that instruction was not first presented to the trial court. *See Smith v. State,* 506 N.E.2d 31, 34 (Ind.1987). An attempt to do so results in waiver of the issue. *Id.*

---

**13.** Michigan Mutual neither tendered a preliminary instruction in this regard nor objected to the one given.

**14.** Thirty-seven of these were tendered by Michigan Mutual.

**15.** Specifically, Michigan Mutual claims the Hopper agency had "limited authority to bind [it]

to coverage and accept premiums on its behalf," but not the authority to "alter policy provisions, appoint subagents, or do anything else that general agents typically can do." Michigan Mutual's Brief at 23. It cites neither authority nor evidence in the record to support the latter proposition.

■ Waiver notwithstanding, Michigan Mutual's argument fails. Michigan Mutual first contends that pursuant to *Farm Bureau Mut. Ins. Co. v. Coffin,* 136 Ind.App. 12, 186 N.E.2d 180, 182 (1962), the evidence indicates that Hopper was a special agent—not a general agent. *Coffin* contains definitions of both a general agent and a special agent. Michigan Mutual does not explain how that portion of *Coffin* which it cites[16] applies to the facts in this case. Moreover, the issue in *Coffin* was whether there was sufficient evidence that an insurance company had clothed an employee with apparent authority to justify a third party's belief that the employee could orally bind the insurer. Thus, consideration of the agent's apparent authority—on which the trial court instructed the instant jury[17]—is critical. Since the trial court did not define a general agent, the challenged instruction read with the instruction on apparent authority tells the jury to determine whether Hopper could reasonably have been perceived to have the apparent authority to do certain things.

■ The second part of Michigan Mutual's argument is that *Farmers Mut. Ins. Co. v. Wolfe,* 142 Ind.App. 206, 233 N.E.2d 690 (1968) "held that only a general agent can issue **oral** binders of insurance." Michigan Mutual's Brief at 22 (bold in original). In *Wolfe,* we held that an agent was "a special agent, . . . not clothed with specific authority to bind his principal orally," when there was no "evidence of past acts performed from which [the potential insured] could have rea-sonably" believed that the agent had "the apparent authority to orally bind his principal." *Id.* at 696, 697. Thus, *Wolfe* does not hold that only a general agent may orally bind the insurer but rather that a special agent may do so where there is evidence of past acts performed which could reasonably lead the third party to believe the agent is clothed with the apparent authority to orally bind. Accordingly, *Wolfe,* argued to the trial court in this regard with respect to another instruction, does not preclude the instruction given.

■ Michigan Mutual claims there is no evidence that Hopper was a general agent for it. We consider only the evidence most favorable to the appellee and any reasonable inferences to be drawn therefrom. *Homehealth,* 600 N.E.2d at 975. If any evidence supports the instruction, we will uphold the trial court's giving of it. *Id.* The Michigan Mutual regional manager testified that Hopper "wrote business" for the company, (R. 1724), and that the only way to obtain Michigan Mutual insurance in Indiana was through an agent such as Hopper. The reasonable inferences from this testimony support the giving of the instruction.

Finally, Michigan Mutual contends the instruction impermissibly instructed the jury that Hopper was a general agent. The immediately preceding instruction, which Michigan Mutual does not argue on appeal, stated that Hopper was an agent of Michigan Mutual.[18] As noted, the trial court's instructions

---

16. "A special agent is one who is authorized to do one or more specific acts, in pursuance of particular instructions or within restrictions necessarily implied from the act to be done." 186 N.E.2d at 182.

17. Specifically, the trial court instructed the jury with pattern jury instruction 15.07 as follows:

A principal clothes an agent with "apparent authority" when the principal places the agent in a position to perform acts or make representations on the principal's behalf that appear reasonable to a third person, and the third person acts in reliance thereon. If the third person reasonably believes under the circumstances that the agent is authorized to act, the principal is bound thereby and liable to the third person, even though the agent has, in fact, violated the principal's order or instructions or exceeded the agent's actual authority. However, if the third person knows, or in the exercise of reasonable care should know, that the agent is exceeding the agent's actual authority, the principal will not be bound.
(R. 2259–60).

18. At oral argument, held in Indianapolis on July 9, 1998, Michigan Mutual conceded that it waived appellate consideration of any error with regard to this instruction for failure to have so argued on appeal. Waiver notwithstanding, when read with the other instructions discussed later in this section and considering the lack of an instruction defining a general agent, we do not find the instruction saying that Hopper "was an agent of Michigan Mutual" to have misled the jury because it meant that Hopper was a general agent, but rather it simply indicated that Hopper was an agent.

did not define a general agent. The trial court also instructed the jury about apparent authority as well as implied authority, and the necessity that an agent be acting within the scope of the agent's authority in order for that act to be found the act of the corporation. The court's final instructions again told the jury that it was the sole judge of the evidence and explained what the plaintiff bore in its burden of proving by a preponderance of the evidence in order to find that Michigan Mutual had tortiously breached its obligation of good faith and fair dealing.

We are of the opinion that the jury might have been better instructed had it been given the definition of a general agent, and then instructed that *if* it found Hopper a general agent that "orally bound coverage, then a binding contract of insurance was entered into...." However, when we read the challenged instruction together with the other noted instructions, we do not find the instruction to be a misstatement of the law constituting an abuse of discretion. *See Koziol,* 662 N.E.2d at 991. Further, in its opening statement, throughout trial in its questioning of witnesses, and in its closing, Michigan Mutual made clear its position that Hopper was an agent with limited authority. Therefore, we do not find that the challenged instruction, when read with the other instructions, misled the jury to the effect that Hopper *was* a general agent but rather allowed the jury to consider whether Hopper had the apparent authority to orally bind Michigan Mutual. *Id.*

B. Next, Michigan Mutual asserts that the trial court abused its discretion in refusing to give the jury its tendered instruction as follows:

> The purpose of insurance is to protect against the risk of future loss, not the fact or certainty of past loss.

> An agent of an insurance company has no authority to insure property already destroyed. [citing *Celina Mut. Casualty Co. v. Baldridge,* 213 Ind. 198, 10 N.E.2d 904, 906 (1937)].

> Therefore, if you find that Donna King signed the binder of May 31, 1991, which had been prepared by Pierre Miller, and that Donna King signed that binder after

the fire of June 1, 1991, then you should find that binder to be ineffective and that it provided no insurance coverage for the plaintiff corporation.

(R. 169). According to Michigan Mutual, this tendered instruction represents "[o]ne of the most fundamental principles of insurance law," Michigan Mutual's Brief at 26, as well as accurately stating Indiana law and not being covered by other instructions. As it did before the trial court, Michigan Mutual relies upon *Celina.*

In *Celina,* a certain agent sold insurance for both American States Insurance and Celina Mutual Casualty. Through this agent, Mr. Baldridge obtained automobile insurance from American States for six months beginning in January of 1930; he renewed it in July, through the agent, receiving a policy from American States. He paid the premium for the latter period to the agent. After Baldridge had a collision in November, American States informed him he was not insured because his policy had been canceled for nonpayment of premium. According to the agent, she renewed Baldridge's policy with American States on July 2, 1930, but then canceled it and on July 19th prepared an application and premium payment on his behalf for coverage with Celina. However, the agent failed to mail the application and payment until after Baldridge notified her of his collision. When she did forward both to Celina, she did not indicate that the vehicle sought to be insured had already been destroyed. The court first considered whether a contract had been formed on July 19th, but found it could not have been inasmuch as Baldridge "had not authorized or requested her to change his insurance, and he had no knowledge that a contract with [Celina] was contemplated." 212 Ind. 616, 10 N.E.2d 907. It was only then that the court proceeded to consider whether a contract might have been made after the destruction of the property and stated the proposition which Michigan Mutual asserts is a mandatory instruction here.

The fact that the agent's action in canceling Baldridge's coverage with American States and seeking coverage by Celina was completely without Baldridge's authorization

is one distinction between our case and *Celina*. Because of the way the court's analysis is structured, it is possible that had Baldridge authorized the agent's July 19th action, that fact might have sustained a jury verdict for Baldridge even though the agent failed to timely forward the application and payment. We find another distinction to be that as to Celina, the first contact it ever had with the agent on behalf of Baldridge as a potential insured was after the destruction of his vehicle. Here, testimony indicated that on May 24, 1991, Hopper sent Michigan Mutual a binder for coverage on Sports, Inc. Further, there is no evidence that Celina had accepted other retroactive coverage written by the agent. As the trial court here indicated in ruling not to give the tendered instruction, the evidence "arguably" showed that Michigan Mutual "did in fact accept retroactive binders." (R. 1980). Thus, the course of dealing between Michigan Mutual and Hopper as to the tendering of binders with a retroactive effective date also adds another consideration not present in *Celina*. Finally, in *Celina* there was no company manual providing a "special cases" procedure such as described in FACTS. Given these distinctions, we do not find the evidence presented here renders the trial court's not giving the instruction Michigan Mutual tendered to be an abuse of discretion.

C. Finally, Michigan Mutual claims the trial court abused its discretion in refusing to give the following tendered instruction:

> In order for Defendant Pierre Miller to have had the authority to bind Defendant Michigan Mutual to insurance coverage, there must have been some form of communication, direct or indirect, from Defendant Michigan Mutual to the Plaintiff instilling in Plaintiff a reasonable belief that Defendant Miller would bind Defendant Michigan Mutual to coverage. Statements, manifestations, or bald assertions made by Defendant Miller to Plaintiff are not enough.

(Supp. R. 207).

■ Michigan Mutual first asserts that the trial court indicated in the instructions conference that it would give Michigan Mutual's above instruction—after striking the last sentence. However, Michigan Mutual then concedes that because the final instruction given on apparent authority (recited in footnote 17) [19] contained the substance of its tendered instruction without that final sentence, its claim of error concerns only the trial court's failure to instruct the jury on "how apparent authority **may not** be created." Michigan Mutual's Brief at 31 (bold in original). We do not find the argument persuasive.

■ The trial court instructed the jury that a principal "clothes an agent" with apparent authority when the principal "places the agent in a position...." (R. 2259, 2261). Thus, the only way in which the jury was told that apparent authority could be created was by action of the principal. An additional sentence saying that such authority could not be created by representations of the agent would be repetitive. A party is not entitled to a repetitive instruction. *Captain & Co., Inc. v. Stenberg,* 505 N.E.2d 88, 97 (Ind.Ct. App.1987). The trial did not abuse its discretion in not instructing the jury that Miller's statements were "not enough."

### 2. *Punitive Damages*

■ Michigan Mutual contends the $1,000,000 punitive damage award is grossly excessive State punishment upon a tortfeasor, thereby violating due process under the U.S. Constitution pursuant to *BMW of North America v. Gore,* 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996).

In *BMW,* as in *Pacific Mut. Life Ins. Co. v. Haslip,* 499 U.S. 1, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991), the Supreme Court declined to establish a single test for determining whether an award of punitive damages violates the Constitution. *Dean v. Olibas,* 129 F.3d 1001, 1006 (8th Cir.1997) (citing 517 U.S. at 585–86, 116 S.Ct. at 1604). However, the Court has articulated certain factors to

19. Michigan Mutual's requested jury instructions included the pattern jury instruction given on

apparent authority. (Supp. R. 201).

be considered in making this determination. *Id.*

First, "a judgment that is a product of [fair procedures] is entitled to a strong presumption of validity." *Id.* (quoting *TXO Production Corp. v. Alliance Resources Corp.,* 509 U.S. 443, 457, 113 S.Ct. 2711, 2720, 125 L.Ed.2d 366 (1993); and also citing *Haslip*). Where impartial jurors were selected; the jurors heard all the evidence presented by both sides; the trial court properly instructed the jury on the law; and the trial court upheld the punitive award after considering its constitutionality, there is a presumption that the award is constitutional. *Id.* Here, impartial jurors were selected; the jurors heard all the evidence presented by the parties; the trial court properly instructed the jury on the law; and the trial court considered Michigan Mutual's argument of constitutionality pursuant to *BMW* in its motion to correct error, which it denied. Accordingly, we begin our review of the legality of this award with the presumption that it is constitutional.

In *BMW,* the Supreme Court held that the most important indicium of the reasonableness of a punitive damages award might be "the degree of reprehensibility of the defendant's conduct." 517 U.S. at 575, 116 S.Ct. at 1599. Michigan Mutual's conduct evidences some of the characteristics that justify the imposition of substantial punitive damages. First, Michigan Mutual's denial that Sports, Inc. was insured was intentional misconduct—never has the company claimed that the denial was an accident, oversight, or omission. "In *TXO* and *Haslip,* in each of which the defendant was responsible for purposeful malfeasance, the Court upheld the punitive awards." *Dean,* 129 F.3d 1001, 1007 (citing *TXO,* 509 U.S. at 453, 113 S.Ct. at 2717–18; *Haslip,* 499 U.S. at 14–15, 111 S.Ct. at 1041–42). "In *BMW,* to the contrary, the Court based its reversal of the award partly on the absence from the record of 'deliberate false statements' and 'acts of affirmative misconduct.'" *Id.* (citing *BMW,* 517 U.S. at 575, 116 S.Ct. at 1599).

Second, *BMW* indicates that "especially" when economic injury is inflicted "intentionally through affirmative acts of misconduct," or upon a "financially vulnerable" target, "a substantial penalty" may be warranted. 517 U.S. at 575, 116 S.Ct. at 1599. Michigan Mutual's conduct was intentional, and a business rendered inoperable by fire is extremely financially vulnerable.

Third, as to Michigan Mutual's argument that the reprehensibility of its conduct is lessened by the fact that Sports, Inc.'s loss was "purely economic ... as opposed to involving death or personal injury," Michigan Mutual's Brief at 34, we cannot agree. The principals in the bowling alley had to undertake for themselves all the tasks involved in achieving the restoration of the bowling alley *and* had to hire legal counsel to obtain recovery from the electrical contractor. The infliction of "significant noneconomic harm" on the plaintiff, apart from that reflected in the compensatory damages award, was considered by the Eighth Circuit in its reprehensibility analysis under *BMW* in *Dean,* an action against a bail bondsman where a man was wrongfully arrested (based upon erroneous information from the bail bondsman) while eating dinner with his wife and children. 129 F.3d at 1007. We find such significant noneconomic harm present here.

Finally, Michigan Mutual asserts that its having provided the investigation report about the cause of the fire should weigh in its favor in our consideration of reprehensibility. This argument was strongly argued to the jury, not only as to assessing punitive damages but also as to whether Michigan Mutual had acted tortiously and as to whether punitive damages were warranted. The adjuster, Watson, testified that on his first visit to the burned bowling alley he talked with the fire marshall and concluded that "most probably" the fire resulted from an extension cord installed by the electrical contractor. (R. 1793). Thus, the evidence supports the inference that the investigation report was not critical to Imperial Lanes of Sports, Inc.'s being able to recover from the contractor.

Upon consideration of the reprehensibility factor, the nature of Michigan Mutual's misconduct does not require us to conclude that the punitive damages assessed against it were unconstitutional. *See Dean,* 129 F.3d at 1007.

The Court held in *BMW* that "[t]he second and perhaps most commonly cited indicium of an unreasonable or excessive punitive damages award is its ratio to the actual harm inflicted on the plaintiff." 517 U.S. at 580, 116 S.Ct. at 1601. Michigan Mutual argues that the $1,000,000 punitive damages award must be found excessive by application of this factor because it is "close to 14 times the $72,047.81 in compensatory damages awarded," and *Haslip*, 499 U.S. at 23–24, 111 S.Ct. at 1046 , held that "a punitive damage award of more than 4 times the amount of compensatory damages is close to crossing the line into the area of constitutional impropriety." Michigan Mutual's Brief at 39. Accepting *arguendo* Michigan Mutual's contention that the $72,047.81 figure is the one for ratio comparison,[20] its argument fails to acknowledge the subsequent *TXO* decision, wherein the Court upheld punitive damages it computed at a 10:1 ratio based on the harm that would have ensued if the tortious plan had succeeded, a damages award which on its face reflected punitive damages in an amount 526 times the actual damages.

In its proportionality discussion, *BMW* first noted the "principle that exemplary damages must bear a 'reasonable relationship' to compensatory damages." 517 U.S. at 580, 116 S.Ct. at 1601. *BMW* then emphasized that the Court continues to "reject the notion that the constitutional line is marked by a simple mathematical formula," and that there is no "mathematical bright line between the constitutionally acceptable and the constitutionally unacceptable." 517 U.S. at 582, 116 S.Ct. at 1602. Moreover, imposition of punitive damages may take into consideration the harm that might be inflicted on other victims if similar future behavior were not deterred. *Dean*, 129 F.3d 1001 (citing *TXO*).

In *Dean*, the Eighth Circuit upheld punitive damages fourteen times greater than the compensatory damages. 129 F.3d, 1008. In *Parsons v. First Investors Corp.*, 122 F.3d 525 (8th Cir.1997), the Eighth Circuit upheld damages more than eleven times greater than compensatory damages. In *Cooper v. Casey*, 97 F.3d 914 (7th Cir.1996), the Seventh Circuit upheld punitive damages at least twelves times greater than compensatory.[21]

Given the nature of Michigan Mutual's conduct in the case at bar, we do not find that punitive damages in an amount nearly fourteen times the compensatory damages awarded so lacks a reasonable relationship between those two figures as to render the punitive damage award constitutionally unacceptable.

The final factor *BMW* provides for our consideration is the comparison of "this remedy and the civil penalties authorized or imposed in comparable cases." 517 U.S. at 575, 116 S.Ct. at 1598–99. Indiana Code § 27–4–1–4.5 defines certain "unfair [insurance] claims settlement practices." One unfair claim settlement practice is to misrepresent pertinent facts or insurance policy provisions relating to coverages at issue. I.C. § 27–4–1–4.5(1). Another unfair practice is the failure to adopt and implement reasonable standards for the prompt investigation of claims. I.C. § 27–4–1–4.5(3). A third unfair practice is the refusal of a claim without conducting a reasonable investigation based on all available information. I.C. § 27–4–1–4.5(4). Other unfair practices include the compelling of an insured to institute litigation to recover amounts due under an insurance policy and failing to promptly provide a reasonable explanation of a denial. I.C. § 27–4–1–4.5(7), (14). Evidence at trial could support the conclusion that these practices occurred.

**20.** Sports, Inc. argues that the comparison should be made with a damages figure reflecting the $300,000 recovery from the electrical contractor. It contends such an amount would be the *BMW* "actual harm" which the jury must have found it to have incurred inasmuch as the jury had been instructed to reduce the benefits to which it found the bowling alley to be entitled under the policy by any recovery from the entity that caused the fire.

**21.** The ratio may be much greater. *Cooper* involved seven defendants. The total compensatory damages awarded were $5,000, and the decision does not indicate any apportionment in this regard. The total punitive damages were $60,-000, and the decision indicates that the "highest" was in the amount of $22,500 against one defendant. 97 F.3d at 920. If this defendant inflicted one-seventh the damage ($714), the $22,500 punitive award was more than thirty-one times that amount.

A $50,000 fine may be assessed for a single violation, and a penalty can be imposed "for each act or violation" for an aggregate penalty reaching $200,000. Ind.Code § 27–4–1–6. Thus, Michigan Mutual could have been fined $200,000 for its actions in denying Sports, Inc.'s claim.

Here, Michigan Mutual is subject to a punitive damage award five times greater than the civil fine it might have incurred for this conduct. In *BMW*, violation of a comparable state statute carried a maximum penalty of $2,000, yet the punitive award appealed was $2,000,000—a ratio of 1,000:1.[22] We do not find *BMW* to suggest that the punitive award here constitutes a disproportion of constitutional dimensions.

Michigan Mutual's false statements and acts of affirmative misconduct constituted deliberate misconduct. Sports, Inc., was financially vulnerable and suffered significant noneconomic harm. Similar harm might be inflicted on other claimant insureds. Therefore, although the ratio of punitive to actual damages here is high, we do not conclude that the punitive damages are so grossly excessive as to violate the constitutional limits of due process.

We affirm.

GARRARD, J., concurs.

RUCKER, J., concurs in result.

---

22. *BMW* also notes the *Silkwood v. Kerr–McGee Corp.*, 464 U.S. 238, 104 S.Ct. 615, 78 L.Ed.2d 443 (1984), punitive damage award of more than 10 times the largest fine previously imposed, and the *New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), punitive award 1,000 times greater than provided under a state statute.